## Waschak v. Moffat, Appellant.

Argued April 19, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Bernard G. Segal,* with him *Edward W. Mullinix, Matthew D. Mackie, J. Hayden Oliver, Wm. A. Schnader, Welles & Mackie* and *Schnader, Harrison, Segal & Lewis,* for appellants.

*Raymond T. Law,* with him *Will Leach* and *John R. Lenahan,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, November 8, 1954:

The appeal is from a judgment of the Superior Court refusing to enter judgment *non obstante veredicto* for defendants in an action in trespass and affirming the judgment of the Court of Common Pleas of Lackawanna County in favor of plaintiffs.

Gas or fumes from culm banks, the refuse of a coal breaker, damaged the paint on plaintiffs' dwelling. In this action for damages the applicable legal principles are technical and controversial. Considerable confusion appears in the many cases. The field is that of *liability without fault for escape of substances from land.*

Plaintiffs are owners of a dwelling in the Borough of Taylor which is in the center of Pennsylvania's anthracite coal lands. An action in trespass was instituted against two partners, operators of a coal breaker in that Borough. Without fault on the part of defendants, gas known as *hydrogen sulfide* was emitted from two of defendants' culm banks. This caused discoloration of the white paint (with lead base) which had been used in painting plaintiffs' dwelling. The painted surface became dark or black. The sole proven damage was the cost of restoring the surface with a white paint, having a titanium and zinc base, which will not discolor. There was no other injury either to the building or occupants. The verdict was for $1,250.

While the verdict is in a relatively modest amount, the principles of law involved, and their application, are extremely important and far reaching. Twenty-five other cases are at issue awaiting the decision in this case. The impact of this decision will affect the entire coal interests—anthracite and bituminous—as well as other industries. Application of appropriate legal principles is of vital concern to coal miners and to other labor.

The pivotal facts are undisputed. To mine anthracite coal, either by deep or strip mining, requires processing in a coal breaker before marketing. Usable coal, broken to various sizes, must first be separated from its by-products of minerals, rock, etc. The by-products are deposited in piles known as culm banks, portions of which may be reclaimed, while other parts are presently regarded as waste. The mining and processing in the present case are conceded to have been conducted by defendants without fault. Fires frequently appear in the culm banks long after the accumulation. Defendants neither committed any negligent act nor omitted any known method to prevent combustion, fires or the emission of gases. In addition to *hydrogen sulfide* two other gases, *carbon monoxide* and *sulfur dioxide* were shown to have also been emitted, but it is not contended that either of these two gases affected the paint in question. *Hydrogen sulfide* was conceded to have been the gas which caused the damage. The emission of this gas is not ordinarily found in the operation of coal mining and processing. *Defendants did not know and had no reason to anticipate the emission of this gas and the results which might follow.* Of the five culm banks only two of them, the Washington Street bank and the settling basin were shown to have emitted *hydrogen sulfide.*

In the court below the case was tried on the theory of *absolute liability* for the maintenance of a nuisance. The jury was instructed that it should determine, as a *matter of fact,* whether or not what the defendants did and the conditions resulting therefrom constituted a "reasonable and natural use" of defendants' land. The Superior Court declined to adopt the rule of *absolute liability.* That court followed Restatement, Torts, Chapter 40 which relates to *"liability without fault".* The verdict was affirmed, however, because, as stated in

the opinion, "[a] vast quantity of coal was brought . . . from lands *outside the borough* . . ." and ". . . the fact that *hydrogen sulphide* gas had not been generated in any of the existing . . . culm banks, made up wholly of wastes from coal mined in the borough, it was a fair inference for the jury that a *different chemical content in the foreign coal* which defendants hauled to the borough and processed there, accounted for the presence of the gas in the atmosphere. . . ." (Italics supplied)

The measure of liability for the escape of substances from land has been a controversial subject in the law. Much learning has been expended in this field. Unquestionably there is confusion in the host of cases on the subject. Judge ROBINSON tried the case in the court below with care. His charge and opinion reflect scholarly thought and effort. Judge HIRT, with his accustomed learning and acumen, reviewed the facts and the law. Both opinions merit great respect. Legal articles, extensively documented, have been published on the subject. An informative treatise titled "The Absolute Nuisance Theory in Pennsylvania" is found in 95 U. of Pa. L. Rev. 781. Hon. Charles E. KENWORTHEY, formerly a Judge in the Superior Court, has written an article titled "The Private Nuisance Concept in Pennsylvania: A Comparison With The Restatement" reported in 54 Dick. L. Rev. 109. The Restatement of the Law, Chapter 40 of Torts, sections 822 to 840, with scope and introductory note, on the "Invasions of Interests in the Private Use of Land (Private Nuisance)" with Pennsylvania Annotations in the 1953 Pocket Supplement, restates the law.

From the multitude of cases there appear to have been promulgated three rules of law where there has been an invasion of interests in the private use of land. They arise most frequently where, without negligence

or fault, material escapes to the land of another causing damage. The rules may be thus stated:

(1) English rule of *Rylands v. Fletcher,* L. R. 3 H. L. 330 (a leading case which is frequently cited)

(2) Absolute Nuisance Doctrine

(3) Restatement Rules.

### (1) *Rylands v. Fletcher*

The English rule, supra, is concisely expressed by Lord CRANWORTH as follows (p. 340) : ". . . If a person brings, or accumulates, on his land anything which, if it should escape, may cause damage to his neighbour, he does so at his peril. If it does escape, and cause damage, he is responsible, however careful he may have been, and whatever precautions he may have taken to prevent the damage." The strict doctrine of *Rylands v. Fletcher,* supra, has not been followed by this Court: *The Pennsylvania Coal Company v. Sanderson,* 113 Pa. 126, 6 A. 453; *Householder v. Quemahoning Coal Co.,* 272 Pa. 78, 116 A. 40; *Venzel v. Valley Camp Coal Co.,* 304 Pa. 583, 156 A. 240.

### (2) *Absolute Nuisance Doctrine*

Instead of the English doctrine, ordinarily this Court has heretofore applied what has been termed the Absolute Nuisance Doctrine. As pointed out by Judge KENWORTHEY, much of the confusion in this field is due largely to the diversification in defining the word *"nuisance"*. There is a nuisance *per se* and a nuisance *in fact*. Thus a gas station in a residential neighborhood may be a nuisance *per se,* but a retail grocery supermarket while not a nuisance *per se* may become a nuisance *in fact* if improperly conducted: *Essick v. Shillam,* 347 Pa. 373, 32 A. 2d 416. There is also confusion respecting failure to distinguish between trespass and nuisance. Many of the cases have used the phrase *"it is not a question of negligence, but of nuisance"*: *Pottstown Gas Company v. Murphy,* 39

Pa. 257; *James Gavigan v. The Atlantic Refining Company*, 186 Pa. 604, 40 A. 834; *Stokes v. Pennsylvania Railroad Company*, 214 Pa. 415, 63 A. 1028. In *Kramer v. Pittsburgh Coal Company*, 341 Pa. 379, 19 A. 2d 362, when defining nuisance, Chief Justice SCHAFFER said (p. 381): " '. . . In legal phraseology, the term "nuisance" is applied to that class of wrongs that arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real or personal, or from his own improper, indecent, or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, and producing such material annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage:' 46 C. J. 645-646. 'Nuisance is distinguishable from negligence:' Ibid, 650. 'The distinction between trespass and nuisance consists in the former being a direct infringement of one's right of property, while, in the latter, the infringement is the result of an act which is not wrongful in itself, but only in the consequences which may flow from it:' Ibid, 651. As we stated in Summit Hotel Co. v. National Broadcasting Co., 336 Pa. 182, 189, 8 A. 2d 302: 'In cases of trespass for nuisance, the person responsible may be unable, no matter how careful, to avoid injury to the lands of another, but, again, he knows that injury may result from the nature of his activities regardless of care. Under such circumstances he also assumes the risk. The responsibility for injury lies in creating or maintaining the harmful condition.' "

An invasion of an interest may be *intentional* or *unintentional*. If an owner of land erects a factory upon it, which he operates, his act is, of course, *intentional* when he ignites fires under the boilers which emit smoke or fumes and operate noisy machinery. Such intentional operations *may* become a nuisance

and cause damage to an adjoining property, depending upon the method of operation, location of the premises and surrounding circumstances. Under varying conditions the harm caused by the emission of offensive odors, noises, fumes, violations, etc., must be weighed against the utility of the operation. And even where the invasion of property rights is unintentional, and without negligence, if the activity is *ultrahazardous* there will be imposed an absolute liability for damages. Thus in a blasting operation, recovery was had where the damage was due solely to vibration and concussion: *Federoff v. Harrison Construction Co.,* 362 Pa. 181, 66 A. 2d 817.

To attempt to cite the host of cases and analyze them would be a Herculean task and prove uneffective. Many of the cases are cited in the Pennsylvania Annotations to the Restatement, Torts, supra.

### (3)  *Restatement Rules*

The Rule of the Restatement, which unquestionably is accurate and most comprehensive, is as follows:

"Section 822.  GENERAL RULE.

The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if,

(a)  the other has property rights and privileges in respect to the use or enjoyment interfered with; and

(b)  the invasion is substantial; and

(c)  the actor's conduct is a legal cause of the invasion; and

(d)  the invasion is either (i) intentional and unreasonable; or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct."

This rule we adopt. We agree that the adoption will obviate the difficulty and confusion in attempting to reconcile or distinguish the great mass of cases. We are not violating precedent and are not conflicting, in major degree, with the principles of *stare decisis.*

We must apply the principles of law enunciated by the Restatement to the facts of this case. Judge HIRT, in his opinion, has ably summarized the principal facts as follows: "In the light of the verdict, based upon testimony in which there is little dispute, these material facts appear: For more than 50 years coal mining has been the most important industry in the Borough of Taylor. Glen Alden Coal Company owned large tracts of land in the borough extending into the township on which it had conducted extensive mining operations during that period. It processed the coal at a large breaker in the borough, located within a few hundred feet of the property now owned by the plaintiffs. In accordance with the general practice, and with the consent of the borough, Glen Alden deposited the by-products of mining, consisting of waste material and coal which could be made saleable by reprocessing, in a culm bank as close to the breaker as possible without interfering with its operation. Glen Alden ceased operating the mines in 1932 and there was then a large refuse dump near the breaker. In 1937 the defendants undertook to reopen the mines and among the lands then leased to them by Glen Alden, were two large tracts, one fronting 2,500 feet on Washington Street in the borough, and the other near the breaker extending along Main Street for about one-half mile. Defendants from 1937 to 1944 by means of a conveyor line from the breaker, built up an extensive bank of culm or reclaimable sulphurous coal adjacent to the existing Glen Alden Bank, referred to as the Main

Street dump. This bank was abandoned in 1944 when it started to burn. In the years that followed defendants, from necessity, turned to other locations for their culm banks. In 1944 they started to deposit culm on Washington Street, within the borough, which ultimately developed into a bank 10 to 60 feet high extending 800 feet along Washington Street and 750 feet along an alley in the rear of Union Street. This bank began to burn in 1948 and further dumping was then discontinued. Defendants then began the construction of a large settling basin near their Main Street dump. The walls of the so-called 'silt dam' were 25 feet high and were constructed principally of breaker refuse. The function of the structure was to separate silt from the water used in processing coal at the breaker, to comply with the Act of June 22, 1937, P. L. 1987, 35 PS §691.1 et seq., before discharging it into natural streams. Still another culm bank was started in 1949 on Fourth Street in the borough and defendants continued to deposit wastes from the mine at that location until May, 1951, when this dump also began to burn. The Fourth Street bank was 500 feet in length, 500 feet wide and 40 feet high. Extensive ramps to the dump were also made of breaker refuse material. Defendants are now using a new location as a dumping ground, between the Washington and the Fourth Street culm banks.

"The complaint in this case charged defendants with the creation of a nuisance resulting from the release of poisonous and obnoxious gases. Sulphur dioxide was discharged from the burning dumps but the proofs relate to damages caused by hydrogen sulphide alone. Hydrogen sulphide may be generated in culm banks without fire and the evidence is that the gas in the atmosphere in the borough was emitted from two of

defendants waste dumps, beginning in 1948, viz: the Washington Street bank and the silt dam around the settling basin. . . . [U]nder the proofs, there was no intentional invasion of plaintiffs' use and enjoyment of their land and the defendants' conduct in the operation of their collieries was not negligent, reckless or ultrahazardous. . . . [D]efendants' mining operations did not create an 'absolute nuisance' in a legal sense and their liability therefore is not absolute, regardless of fault."

Prior to the year 1934 the Glen Alden Coal Company, owners, had ceased to mine coal in this area. The colliery in question was idle, the breaker was dismantled and miners in Taylor Borough were out of work. A committee of citizens of the Borough called upon the Glen Alden Coal Company requesting that the mines be reopened in order to aid the citizens. The Glen Alden Company agreed to this and leased coal lands comprising a continuous area of coal veins running from Taylor to Dickson City. When the defendants, in 1934, first began to operate the breaker a large culm bank close to the breaker was in existence and was then burning. In 1937 a new culm bank was started because of the fire in the old one and a conveyor was used to carry the culm to the new location. This was the Main Street bank and was used from 1937 to 1944. A new bank was then started known as the Washington Street bank, which was used from 1944 until October 1948. This bank was the same distance from the breaker as the Main Street bank, but in the opposite direction. In 1948 defendants commenced the construction of a settling basin in compliance with the State law concerning pollution of streams. During the construction the State inspectors approved. In 1949, six months after the Washington Street culm bank was discontinued, fire was discovered and defendants

ceased using this breaker material for the settling basin. In the spring of 1949 walls in the settling basin ignited.

It is significant that plaintiffs purchased their home on June 23, 1948. It was close to the breaker, near the Washington Street bank.

Of the various gases emitted from the five culm banks, *hydrogen sulfide* was the gas which caused the damage. The record shows that this was emitted only from the Washington Street bank and the settling basin and from no others. Defendants did not know, and had no reason to be aware, that this particular gas would be so emitted and would have the effect upon the painted house. The record shows that the defendants were guilty of no negligence and used every known means to prevent damage or injury to adjoining properties.

Even if the reasonableness of the defendants' use of their property had been the *sole* consideration, there could be no recovery here. Chief Justice FRAZER, in *Harris v. Susquehanna Collieries Co.*, 304 Pa. 550, 156 A. 159, quoting from a previous case, said (p. 558): ". . . As said in Pa. Coal Co. v. Sanderson, 113 Pa. 126, 158: 'The plaintiffs knew, when they purchased their property, that they were in a mining region; they were in a [district] born of mining operations, and which had become rich and populous as a result thereof. . . .' "

This statement has peculiar application here. The dwelling in question had been formerly used by a mine inspector who doubtless desired to be close to the breaker. When plaintiffs purchased the dwelling they were fully aware of the surrounding situation.

In *Versailles Borough v. McKeesport Coal & Coke Co.*, 83 P. L. J. 379, Mr. Justice MUSMANNO, when a county judge, accurately encompassed the problem when he said: "The plaintiffs are subject to an annoy-

ance. This we accept, but it is an annoyance they have freely assumed. Because they desired and needed a residential proximity to their places of employment, they chose to found their abode here. It is not for them to repine; and it is probable that upon reflection they will, in spite of the annoyance which they suffer, still conclude that, after all, one's bread is more important than landscape or clear skies.

"Without smoke, Pittsburgh would have remained a very pretty *village*." In *Pregrad v. Ocean Coal Company*, 14 D. & C. 438, the syllabus reads: "A coal mining company is not responsible in trespass for damage caused to plaintiff's property by smoke, dust and gases from a burning 'slate dump' on defendant's property, the material having been placed on the dump in the course of operation of defendant's mine and the fire having originated from spontaneous combustion, if there is no known method by which such fires can be extinguished." In *Lauff v. Pittsburgh Coal Co.*, 10 Wash. 161, Judge CUMMINS, in a unanimous opinion, in which Judge HOWARD W. HUGHES (later a Justice of this Court) joined, held: "The general rule that one must use his own land so as not to injure that of another,— otherwise he is liable in damages, is subject to the exception that every man has the right to the natural use and enjoyment of his own property, and if whilst lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria,* for the rightful use of one's own land may cause damage to another, without any legal wrong."

Chief Justice MAXEY said in *Hannum v. Gruber*, 346 Pa. 417, 423, 31 A. 2d 99, "What is reasonable is sometimes a question of law, and at other times, a question of fact." Under the undisputed facts in this case the question is one of law. . . .

The learned court below was in error when it ruled that this case was one of *absolute nuisance*. To compound the error it was ruled that it was "unreasonable and unwarranted" to process coal which was not connected with, or necessary to, the mining of coal *"underlying the surface [the coal breaker] occupies"*. The coal leases to defendants did not limit the operation to coal under the breaker. On the contrary, the leases covered coal veins extending from the owner's land in Taylor through that borough to Dickson City. As the coal in this entire area is granted we see no reason why it cannot be *processed on any portion of the land leased*.

The Superior Court correctly refused to adopt the doctrine of *absolute nuisance*. It cited the Restatement. Judge HIRT said: ". . . Section 822 of the Restatement, Torts, sets forth *some* of the tests for determining liability resulting from a private nuisance. . . ." (Italics supplied) It is our view that Section 822 comprehensively encompasses the *entire* statement of principles of liability and is not restricted merely to *some* of them. We do not agree with the statement: ". . . A vast quantity of coal was brought to Taylor from lands outside the borough and in referring to that fact the trial judge properly charged that the deposit of the waste within the borough in processing such coal was not a natural use of the land. . . . [T]he fact that hydrogen sulphide gas had not been generated in any of the existing . . . culm banks, made up wholly of wastes from coal mined in the borough, it was a fair inference for the jury that a different chemical content in the foreign coal which defendants hauled to the borough and processed there, accounted for the presence of the gas in the atmosphere . . ."

No coal was shown to have been mined or processed other than that from the leased land; the mined coal

was part of the same leased veins whether within or beyond the corporate surface limits of the borough; there is no evidence that there existed any "foreign coal". Certainly the jury should not be permitted to *conjecture* whether coal outside borough limits possessed a different chemical content than coal within the borough.

In applying the rule of the Restatement, Torts, Sec. 822 (d), it is evident the invasion of plaintiffs' land was clearly *not intentional*. And even if it were, for the reasons above stated, it was not unreasonable. On the contrary, since the emission of gases was not caused by any act of defendants and arose merely from the normal and customary use of their land without negligence, recklessness or ultrahazardous conduct, it was wholly *unintentional,* and no liability may therefore be imposed upon defendants.

The judgment is reversed and is here entered in favor of defendants *non obstante veredicto.*

---

Dissenting Opinion by Mr. Justice Jones:

I dissent. The majority opinion works a denial of the plaintiffs' right to a day in court on a material and crucial issue of fact.

On the majority's *ratio decidendi* (which was broached for the first time by defendants' counsel in the Superior Court and which that court rejected), the plaintiffs are at least entitled to an opportunity to litigate what has now become an essentially controlling issue of fact as to whether the defendants' conduct which caused the damage was intentional.

---

Dissenting Opinion by Mr. Justice Musmanno:

The plaintiffs in this case, Joseph J. Waschak and Agnes Waschak, brother and sister, own a modest home in Taylor, Pennsylvania, a town of 7,000 in-

habitants in the anthracite region of the northeastern part of the State. The defendants, Robert Y. Moffat and W. K. Moffat, Co-Partners Trading as Moffat Coal Company, lease and operate a coal breaker in this town. They also have under lease coal properties in Taylor, Scranton, Dickson City and Lackawanna Township. The coal obtained from these properties is processed and made ready for marketing at the Taylor breaker.

In the preparation process the coal undergoes a cleansing process known as the Menzies treatment. A specific gravity is built up with pumps or pressure whereby the lighter material floats on the surface and is drawn off as marketable coal. The impurities—slate, rock and coal with sulphur—being of heavier weight, sink to the bottom and become waste or refuse. This refuse is hauled away and, when piled in one location, the resulting heap is known as a culm pile or bank. These banks often attain mountainous proportions. In time the accumulated refuse undergoes a mysterious transformation and it generates various types of gases, mostly of a foul, insidious and pervasive nature. One of these gases, the culprit in this case, is hydrogen sulfide. It is an odoriferous gas. One of the consulting chemists testified at the trial: "Hydrogen sulfide gas is a very odoriferous gas. It can be detected by the nose in a concentration of less than one part per million. It is also a very poisonous gas. A concentration of hydrogen sulfide as permitted by state labor departments is of the same order as that permitted by those departments for hydrocyanic gases. The effects are dependent on the concentration. That is, in high concentration the one part per thousand say, it is almost instantly fatal. Lower concentrations cause chronic poisoning, and continuous exposure to very

low concentrations causes malaise, nausea, headaches. In some cases it causes shortness of breath."

In 1948 the plaintiffs painted their house with a white paint. Some time later the paint began to turn to a light colored brown, then it changed to a grayish tint, once it burst into a silvery sheen, and then, as if this were its last dying gasp, the house suddenly assumed a blackish cast, the blackness deepened and intensified until now it is a "scorched black." The plaintiffs attribute this chameleon performance of their house to the hydrogen sulfide emanating from the defendants' culm deposits in the town—all in residential areas. The hydrogen sulfide, according to the plaintiffs, not only assaults the paint of the house but it snipes at the silverware, bath tub fixtures and the bronze handles of the doors, forcing them, respectively, into black, yellowish-brown and "tarnished-looking" tints.

Because of these and other complaints, the plaintiffs have charged the defendants with maintaining a nuisance. They sued the defendants in trespass, the case was tried before a court and jury, and on October 9, 1951, the jury returned a verdict in favor of the plaintiffs in the sum of $1250. The defendants moved for a new trial and judgment n.o.v. The lower court refused both motions and entered judgment on the verdict. The defendants appealed to the Superior Court which affirmed the judgment, and the case came to us because of the important legal questions involved. It appears that 25 other cases are at issue awaiting this decision.

The Majority of this Court has now reversed the decision of the Superior Court and set at naught the verdict of the jury with the declaration that the defendants are not liable because the emission of gases from the various culm banks "was not caused by any

act of defendants and arose merely from the normal and customary use of their lands without negligence, recklessness or ultrahazardous conduct," that "it was wholly unintentional, and no liability may therefore be imposed." But it is not necessary in these cases to prove recklessness. In *Siwak v. Borough of Rankin*, 72 Pa. Superior Ct. 218, the plaintiff showed that the defendant municipality operated an incinerating plant which produced noisome and noxious vapors to the annoyance and damage of the plaintiff, rendering his dwelling uninhabitable. In affirming the verdict returned by the jury in favor of the plaintiff, the Superior Court said: "*It was not necessary for the plaintiff to show that the business of the defendant was carried on recklessly or not properly managed.* His case was made out if he showed that the defendant's business, though lawful in itself, was carried on clearly to his injury,—that is the standard established in this State in many of our decisions. [Citing cases.] And whether it was a nuisance, and the danger therefrom real and substantial, the court could do no other than submit it, on the evidence to the jury. The defendant's plant was not a nuisance per se; whether it was a nuisance at all depended on the proof; whether plaintiffs' evidence established the fact could not be determined by the court: Gavigan v. Refining Co., 186 Pa. 604." *    . . .

In the case at bar the Trial Judge fairly and clearly put the question to the jury in the following language: "If you find that . . . the defendants were in possession of and occupied the lands that are involved here; that they created and maintained a harmful and continuous condition on the lands which resulted in injury to the plaintiffs' house and impaired the use and enjoyment of it, and that the use the defendants made of

---

* Italics throughout, mine.

their lands was not a reasonable and natural use as I have instructed you, then the plaintiffs would be entitled to a verdict at your hands against all the defendants. "If you find that the condition maintained on the defendants' lands are not in fact harmful or that the plaintiffs' property did not suffer substantial damage because of it, or that despite this, the use the defendants made of their land was a reasonable and lawful and natural use under the law, then the defendants would be entitled to the verdict."

The jury by verdict decided that the defendants did not make a reasonable, lawful and natural use of their land. Reading the record in the case, I am satisfied that the jury was amply justified in their conclusion and I see no warrant for disturbing that verdict. When a property owner so uses his land that it injures his neighbor's the burden is on him to show that he did use his land naturally, reasonably and legally. The defendants in this case failed to meet the burden put on them by the law. In *Pfeiffer v. Brown,* 165 Pa. 267, 274, we said: "It is not to be lost sight of that the defendant's right to injure another's land at all, to any extent, is an exception, and the burden is always upon him to bring himself within it. And his exception is founded on necessity and because otherwise he would himself be deprived of the beneficial use and enjoyment of his own land. Unless that would be the substantial result of forbidding his action, he is not within the immunity of any of the cases."

The evidence here does not show any *necessity* on the part of the defendants to locate the culm banks in the very midst of the residential areas of Taylor.

The Majority Opinion explores the law of nuisance ably but does not indicate whether the circumstances here make out a case of nuisance, although it does say that the lower court erred in ruling that this case

was one of absolute nuisance. My opinion is that there can be no doubt that the defendants were operating an actionable nuisance. The record, which consists of 600 printed pages, overwhelmingly establishes this fact. The poisonous gases lifting from the defendants' culm banks were destructive of property, detrimental to health and disruptive of the social life of the town.

There was evidence that the poisonous hydrogen sulfide was of such intensity that the inhabitants compelled to breathe it suffered from headaches, throat irritation, inability to sleep, coughing, lightheadedness, nausea and stomach ailments. These grave effects of the escaping gas reached such proportions that the citizens of Taylor held protest meetings and demanded that the municipal authorities take positive action to curb the gaseous invasion.

Did the release of the gases from the defendants' culm banks constitute under the law a nuisance? Nearly every witness testifying for the plaintiff as to the nature of the gas rising from the culm banks declared that it had the odor of rotten eggs. Otto John Zang, the town druggist, testified that the gas was like a nocturnal prowler that would come to his window while he was sleeping and wake him up in the middle of the night: "Q. When did you first notice the existence of this odor to any appreciable degree? A. The summer of 1949. Q. And will you describe what the odor smelled like? Describe the odor. A. It smells of rotten eggs. Q. And was it a light odor? A. A very heavy odor. Q. And did it seem to be noticeable or only slightly noticeable? A. So noticeable that it will give you a headache. . . . . Q. After you had been exposed to this particular odor in Taylor for an evening, let's say, what effect if any does it have on you? A. It made me sick to my stomach and gave me a headache which is very hard to relieve. Unless you get into the

fresh air the headaches persists. Q. And what experience have you had at night with reference to sleep? A. It wakes me up."

Gretchen Houser, high school principal, was asked how the odors affected her and she replied: "Why, they give me a headache very often when it is particularly bad on a rainy day or a foggy day or if the wind is just in the right direction to point it at me. I cough and have a terrible headache, and morning after morning I get awake with a headache."

Miss Houser was asked what she observed and she replied: "Well, on rainy days it was a very much worse odor. At all times it was like rotten eggs. At night it is usually worse, and frequently we have to get up and close the windows and sleep in an air-tight room."

Rev. G. Wesley Pippen, minister in the town, was asked to describe the odor in the air. He described it as follows: "It has a smell of sulphur, and I think probably the rotten egg smell would correctly describe it."

Several of the witnesses testified that because of the rotten egg smell which entered their parlors and sitting rooms, it was difficult to entertain visitors. This statement could well qualify as the prize understatement of the case.

It must always be kept in mind that these culm banks were not mole hills. The Main Street dump measured 1100 feet in length, 650 feet in width and 40 feet in height. If these dimensions were applied to a ship, one can visualize the size of the vessel and what would be the state of its odoriferousness if it was loaded stem to stern with rotten eggs. And that is only one of the dumps. There is another dump at Washington Street and, consequently, another ship of rotten eggs. Its dimensions are 800 feet by 750 feet by 50 feet. A third dump measures 500 feet by 500 feet by 40 feet. Then

the defendants constructed a silt dam with the same rotten-egg-smelling materials.

I do not think that there can be any doubt that the constant smell of rotten eggs constitutes a nuisance. If such a condition is not recognized by the law, then the law is the only body that does not so recognize it.

Although the defendants sought to belittle the testimony adduced by the plaintiffs with regard to the intolerable conditions in Taylor caused by the defendants' gaseous banks, it is interesting to note that Defendant Robert Y. Moffat found it convenient and desirable to live outside the Borough of Taylor and, in all the years that he has been operating the coal business which is the subject of this litigation, he never found it profitable to spend a single night in Taylor. Even so, neither he nor his partner can successfully argue that they were unaware of the deleterious fumes rising from the coal refuse which they distributed through the town.

This Court well defined legal nuisance in *Kramer v. Pittsburgh Coal Co.*, 341 Pa. 379, 380: " 'The term [nuisance] signifies in law such a use of property or such a course of conduct as, irrespective of actual trespass against others or of malicious or actual criminal intent, transgresses the just restrictions upon use or conduct which the proximity of other persons or property in civilized communities imposes upon what would otherwise be rightful freedom. In legal phraseology, the term "nuisance" is applied to *that class of wrongs that arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property,* real or personal, or from his own improper, indecent, or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, *and producing such material annoyance, inconvenience, dis-*

*comfort or hurt that the law will* presume a consequent damage.' "

Whether the facts in the case at bar constitute an actionable nuisance is not a question of law. It is one of fact for a jury to determine. In *Gavigan v. Refining Co.*, 186 Pa. 604, 612, we said: "Whether it was a nuisance, and the damage therefrom real and substantial, the court could do no other than submit, on the evidence, to the jury. The defendant's plant was not a nuisance per se; whether it was a nuisance at all depended wholly on the proof; whether plaintiff's evidence established the fact could not be determined by the court. To establish that fact it was not necessary he should prove the business of defendant was carried on recklessly, or was not properly managed. *It was sufficient to show that defendant selfishly carried on a lawful business in a populous neighborhood greatly to plaintiff's injury.* It comes under that line of cases commencing with Pottstown Gas Co. v. Murphy, 39 Pa. 257, where it was held that the question was not one of negligence or no negligence, but of nuisance or no nuisance."

There is a golden rule in law as well as in morals and it reads: "Sic utere tuo ut alienum non laedas." The defendants oppose this maxim with the one that every person has the right to a lawful, reasonable and natural use of his land. But it is entirely possible and in fact desirable that these two maxims live together in peace and harmony. The plaintiffs in this case do not question that the defendants have the right to mine coal and process it, but is it a natural and reasonable use of land to deposit poisonous refuse in residential areas when it can be deposited elsewhere? Certainly the defendants may lawfully operate a breaker in Taylor, and whatever noises, dust and commotion result

from the breaker operation are inconveniences which the plaintiff and other Taylor inhabitants must accept as part of the life of a mining community. But the disposition of the poisonous refuse of a mining operation does not fall within the definition of lawful and normal use of land. Nor is the offending debris in this case a by-product alone of the coal mined in Taylor. Much of the refuse results from coal brought in from distant areas. The cleansing of *that* coal puts the defendants in the category of mills and factories which are unquestionably liable for nuisances created by their operation.

The Majority states that the "emission of offensive odors, noises, fumes, violations, etc., must be weighed against the utility of the operation." In this respect, the Majority Opinion does me the honor of quoting from an opinion I wrote when I was a member of the distinguished Court of Common Pleas of Allegheny County: *Versailles Borough v. McKeesport Coal & Coke Co.,* 83 P.L.J., 379. That was an equity case where the plaintiffs sought an injunction against the defendant coal company for maintaining a burning gob pile which emitted smoke. The coal mine was located in the very heart of an industrialized area which contained factories, mills, garbage dumps, incinerators and railroads, all producing their own individualized smoke and vapors so that it could not be said that the discomforts of the inhabitants were due exclusively to the operation of the coal mine. Furthermore, after hearings lasting one month I found that the operation of the mine in no way jeopardized the health of the inhabitants: "Of course, if the continued operation of this mine were a serious menace to the health or lives of those who reside in its vicinity, there would be another question before us, but there is no evidence in

this case to warrant the assumption that the health of anyone is being imperiled." In the instant case the exact contrary is true. The health of the town of Taylor *is* being imperiled. And then also, as well stated by the lower court in the present litigation, "Many factors may lead a chancellor to grant or deny injunctive relief which are not properly involved in an action brought to recompense one for injury to his land . . . A denial of relief by a court of equity is not always precedent for denying redress by way of damages."

Even so, there is a vast difference between smoke which beclouds the skies and gas which is so strong that it peals the paint from houses. I did say in the *Versailles* case, "One's bread is more important than landscape or clear skies." But in the preservation of human life, even bread is preceded by water, and even water must give way to breathable air. Experimentation and observation reveal that one can live as long as 60 or 70 days without food; one can keep the lamp of life burning 3 or 4 days without water, but the wick is snuffed out in a minute or two in the absence of breathable air. For decades Pittsburgh was known as the "Smoky City" and without that smoke in its early days Pittsburgh indeed would have remained a "pretty village." But with scientific progress in the development of smoke-consuming devices, added to the use of smokeless fuel, Pittsburgh's skies have cleared, its progress has been phenomenal and the bread of its workers is whiter, cleaner, and sweeter.

On September 8, 1939, this Court, speaking through Chief Justice KEPHART, handed down the monumental decision in the case of *Summit Hotel v. National Broadcasting Co.*, 336 Pa. 182. Chief Justice KEPHART there said (p. 189) : "In cases of trespass for nuisance, the person responsible may be unable, no matter how

careful, to avoid injury to the lands of another, but, again, he knows that injury may result from the nature of his activities regardless of care. *Under such circumstances he also assumes the risk.* The responsibility for injury lies in creating or maintaining the harmful condition. In all of these illustrations, the person responsible has, or should have, *prior knowledge of the probable consequences, where the act done, or the instrumentality employed possesses potentialities of serious harm.*"

There can be no doubt that the defendants were thoroughly aware of the probable consequences of their discarding operations before the plaintiffs suffered the damage of which they complain in this litigation. Miss Waschak testified that the Washington-Church Street dump was giving off poisonous fumes before the defendants began the erection of the silt dam: "Q. Now then, at that time when you bought this property on Main Street in Taylor in June, 1948, had the Moffat Coal Company constructed this silt dam? A. No, sir. Q. Did you notice anything with reference to that at the time you purchased the property? A. They were just starting to excavate it. . . . Q. And at that time the Washington Street dump was giving off the fumes, was it? A. Yes, sir."

All of the defendants' refuse dumps have turned into burning mountains. The Main Street dump began to burn in 1944, the Washington-Church Street dump caught fire in 1948, the Fourth Street dump broke into flame in May, 1951, and the silt dam ignited shortly after its construction, and is still burning. It would be difficult to imagine a more effective and continuing notice to the defendants of the nuisance they were creating than the appearance of these volcanic torches, each pouring out hydrogen sulfide of promised disaster to the town.

Even if the rights of the plaintiffs were to be considered by Restatement, Rules they would still be entitled to recover under the proposition that the defendants were so well informed of the probable harmful effects of their operation that their actions could only be regarded as an intentional invasion of the rights of the plaintiff. Section 825 of the Restatement, Torts declares: "An invasion of another's interest in the use and enjoyment of land is intentional when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct."

The record amply proves that the defendants were at least "substantially certain" that their burning culm deposits would invade the plaintiffs' interest in the use and enjoyment of their land.

If there were *no* other way of disposing of the coal refuse, a different question might have been presented here, but the defendants produced no evidence that they could not have deposited the debris in places removed from the residential districts in Taylor. Certainly, many of the strip-mining craters which uglify the countryside in the areas close to Taylor could have been utilized by the defendants. They chose, however, to use the residential sections of Taylor because it was cheaper to pile the culm there than to haul it away into less populous territory.

This was certainly an unreasonable and selfish act in no way indispensably associated with the operation of the breaker. It brought greater profits to the defendants but at the expense of the health and the comfort of the other landowners in the town who are also entitled to the pursuit of happiness.

Practically everyone who writes on the subject of indirect invasion of property rights expatiates on the confusion in the cases, the uncertainty of the authori-

ties, the variation of the precedents and the farrago of the dicta. But in this land of supposed chaos a pole-star guides the way, and that is the test of reasonableness. Law is intended to be the distillation of reason applied to the world of realities. No formalistic dicta or involved formula convinces like pragmatic proof. In *Hannum et al. v. Gruber et al.*, 346 Pa. 417, 423, this Court said: " 'It has been said that a "fair test as to whether a business lawful in itself, or a particular use of property, constitutes a nuisance, is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case." 46 C.J. 655. It has also been said: "Whether the use is reasonable generally depends upon many and varied facts. No hard and fast rule controls the subject. A use that would be reasonable under one set of facts might be unreasonable under another. What is reasonable is sometimes a question of law, and at other times, a question of fact. No one particular fact is conclusive, but the inference is to be drawn from all the facts proved whether the controlling fact exists that the use is unreasonable." 46 C.J. 656.' "

It is because of the many fluctuating factors in the cases themselves that the decisions do not seem to be uniform. In point of juridical history, however, they do follow a pattern of wisdom and justice. No one will deny that the defendants are entitled to earn profits in the operation of their breaker, but is it reasonable that they shall so conduct that business as to poison the very lifestream of existence? Is it not reasonable to suppose that if hydrogen sulfide emanating from culm banks can strip paint from wood and steel that it will also deleteriously affect the delicate membranes of the throat and lungs?

The defendants have made much of the case of *Pennsylvania Coal Company v. Sanderson,* 113 Pa. 126, where this Court did say that: "To encourage the development of the great natural resources of a country, trifling inconveniences to particular persons must sometimes give way to the necessities of a great community." But here we are not dealing with trifling inconveniences. We are dealing with a situation where in effect the inhabitant of Taylor, Pennsylvania, awakens each morning with a basket of rotten eggs on his doorstep, and then, on his way to work finds that some of those eggs have been put into his pocket. No matter how often he may remove them, an invisible hand replaces them. This can scarcely be placed in the category of "trifling inconveniences".

The decision of the Superior Court in this case is logical, fair and in keeping with the philosophy and the pragmatics of the law. It does no violence to the precedents. It applies them in the light of the facts so clearly established in the 600 printed pages of testimony.

I would affirm the decision of the Superior Court.