450 A.2d 1

**John H. HUGHES and Anna Ruth Hughes, his wife,**

v.

**EMERALD MINES CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued March 17, 1981.

Filed April 23, 1982.

Reargument Denied Oct. 7, 1982.

Petition for Allowance of Appeal
Denied Jan. 21, 1983.

428

Harry J. Cancelmi, Jr., Waynesburg, for appellant.

Eric J. Held, Washington, for appellees.

Before PRICE, JOHNSON and MONTEMURO, JJ.

MONTEMURO, Judge:

The instant action concerns the complaint of landowners that a coal company operating on adjacent property caused the failure of one water-well and the pollution of a second well located on plaintiff-appellees' own land.

A jury found for the plaintiffs in the amount of $32,500, basing their measure of damages on the testimony of a local real estate dealer that the property had been worth $42,500 while served by two wells of pure water and that without a source of potable water the salvage value of the land together with a mobile home located thereon would be $10,000.

Defendant-appellant mining company appealed on the following grounds: (1) that there was insufficient evidence of causation for the jury to find the loss of water to be due to its activities in its mining operation; (2) that, even assuming causation, the loss was *damnum absque injuria*, or damage without legal wrong or legal liability; (3) that error was committed when the trial judge instructed the jury to disregard a "mining rights" clause in the landowner's deed to the property; and (4) that the verdict of the jury in awarding damages in the amount of $32,500 was excessive.

We affirm the lower court's decision on the first three issues, but we reverse the award of $32,500 as excessive, and

we remand for more realistic appraisal of actual and consequential damages in view of the testimony of plaintiffs' own witnesses that repair of the wells can be effected at lower cost.

## HISTORY OF THE CASE

The plaintiffs bought this property by a deed dated 1953, pursuant to a mining rights clause set forth in an earlier deed conveying to a predecessor in title in 1921. Thereafter they erected a dwelling and drilled a well to supply water. There was a continuous, ample, potable water supply from this well (hereinafter well # 1) for some twenty-five years until late May or early June of 1978.

In 1977 the plaintiffs purchased a mobile home and installed it on the property for their son's use. At that time a second well (hereinafter well # 2), was drilled, and from its installation until the same period in late May or early June of 1978 the supply was plentiful and potable.

The defendant company owns mining rights under the entire property originally designated the "Adamson Tract." Plaintiffs own the surface rights to a small section of this tract. Defendant owns surface rights in addition to subsurface rights to a portion of the tract contiguous to plaintiffs' property.

In 1975 defendant began to expand its operations into that contiguous portion of the tract. Several airshaft holes were prepared in the same general area. The airshaft which is the focus of this action is located 540 and 600 feet from defendant's two wells, and is known as "grout hole # 4." It was begun on May 9, 1978 and was completed May 29, 1978.

On May 31, 1978, well # 1 went dry. Two or three days later, well # 2 became polluted. During this same period of time, neighboring properties also experienced similar problems with their wells.

On June 8, 1978 plaintiffs notified an agent of defendant of their problems. Since early June of 1978 the plaintiffs have had a tank installed at their residence and their son-in-

law hauls water from his own home to theirs in 55 gallon lots daily. The plaintiffs travel two miles to the home of their son-in-law and daughter to shower, and must now take their laundry to the laundramat twice weekly instead of using the washer in their basement. Water at well # 2 can be used to flush the commode in the trailer, but cannot be used for cooking, cleaning, bathing, or drinking. The court below permitted these damages to be explored, stating that "they have the right to use their land and if the liability deprived them the use of their property, it is their damage." (N.T. 108). Cost of hauling water, attempted well repair, and laundry amounted to some $7,000 worth of out-of-pocket expenses in consequence of the well failures.

Real estate experts testified for plaintiffs and for defendant. Plaintiffs' witnesses estimated loss of value in the land without any source of usable water to be $32,000. Defendant's witness estimated loss to be no more than $12,500, assuming no usable water. Defendant also presented a mining engineer, Mr. Mishra, who opined that deeper drilling was "reasonably certain" to find water, and later estimated the degree of certainty as "98%." (N.T. 226)

Because the lower court expressed surprise at the measure of damages, and because, upon review of the record, we find that *testimony of plaintiffs' own witnesses* amply supports a finding that repair or replacement of these wells may be had at cost far less than the award of $32,500, we set forth samples from the notes of testimony at some length below.

Plaintiffs' own expert witness, Mr. Moore, who had been in the well-repair business in this area since 1948 and who had actual knowledge as to plaintiffs' wells and those of the near neighbors, testified as follows:

Q. Would you tell us, Mr. Moore, what you have found in other houses right next door to this one and on down the road in that area?

A. Right next door, Mr. Braddock restored a pump, he put a new pump in, but about a thousand yards or so, which is Mrs. Sissler's property, which is down this side ... that pump was also covered up and we pulled it and sold her a new pump plus complete water purification ...

Q. Was there any others that you had complaints about?

A. Yes. Mr. Staggers which is on the same side of the road as the shaft, which is about three hundred feet or so from the shaft, called me about his well and I told him what it would cost him, probably around a thousand dollars.

. . . . .

Q. Now, these places that you have mentioned here, was the problem there the same type of problem that Mr. Hughes had?

A. Identically the same. I would say identically the same. I would just be giving my opinion. (N.T. 27–28)

. . . . .

Q. If that was a well with water in it that looked something like, let's use [attorney for plaintiffs'] jar. I assume he is going to use that as Exhibit "A". Is there a possibility for purification to correct the conditions so it would be more suitable for domestic use?

A. Definitely. You can make the water very clear. . . .

Q. Well, just describe generally.

A. O.K. If the water is acidy, then you put an acid neutralizer on it. Then, if you have an iron condition, then you put an iron filter on it. If you do have any bacteria, then you put a clorenator [sic] on it. Then if the water is real hard, then you put a softener on it. Now you are talking around two thousand dollars for this installation. (N.T. 45)

This discussion was followed by explanation of the costs of maintenence of the systems once installed, which witness conceded were modest.

Plaintiffs' real estate Expert Witness stated that, if the wells were replaced, "then it [the property] still has the same type of value I would put on it to start with." (R. N.T. 57)

Plaintiffs' Expert Witness, the man who in fact drilled both wells, gave the following evidence:

Q. Now, did you also go over to Mrs. White's well, who lives right next door to the Hughes property?

A. Yes.

Q. What did you find there?

A. It is similar to John's well. The same circumstances.

. . . . .

Q. What did you have to do to her well?

A. We had to pull the pump and cut off some pipes and shorten it and put it back in.

Q. She had the same problems as Mr. Hughes did?

A. Yes. (N.T. 79–80)

Mr. Hughes, the plaintiff, himself estimated the cost of one well at about $1200, and defendant's expert local real estate witness estimated costs of new wells in the vicinity at $1200 to $1500, which testimony was never contradicted. (N.Y. 117–118)

## THE LAW

This action was tried on the basis of non-trespassory invasion of another's land as set forth in Restatement of Torts, 2d at § 822, and as adopted by the Supreme Court of Pennsylvania in the 1954 case of *Waschak v. Moffat*, 379 Pa. 441, 109 A.2d 310, 54 A.L.R.2d 748 (1954). That section provides as follows:

One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either:

(a) intentional and unreasonable, or

(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

The instant action was tried on the first of the two theories outlined above: that the act of the coal company was intentional and unreasonable. The Restatement at § 825 further defines intentional invasion as follows:

An invasion of another's interest in the use and enjoyment of land or an interference with the public right is intentional if the actor

(a) acts for the purpose of causing it, or

(b) knows that it is resulting or is substantially certain to result from his conduct.

An intentional invasion becomes unreasonable, according to § 826 if:

(a) the gravity of the harm outweighs the utility of the actor's conduct, or

(b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible.

Section 829(a) contributes this analysis of "unreasonableness":

An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if the harm resulting from the invasion is severe and greater than the other should be required to bear without compensation.

Comments following the section immediately *supra* supply further explanation in pertinent part:

. . . certain types of harm may be so severe as to require a holding of unreasonableness as a matter of law, regardless of the utility of the conduct. This is particularly true if the harm resulting from the invasion is physical in character. . . . Aside from the normal requirement that the harm be significant . . . , it is apparent that the more serious the harm is found to be, the more likely it is that the trier of fact will hold that the invasion is unreasonable.

## DISCUSSION

There is no doubt that plaintiffs have suffered a significant harm to use and enjoyment of their property which occurred on or about May 31, 1978. Defendant contends, however, that evidence was insufficient to prove that its activities were the legal cause of the damage sustained.

Defendant's objections, however, are not borne out on the Record. We will not examine each allegation in depth, but

will illustrate the viewpoint of this court by examination of several contentions.

■ Defendant objected to use of some of plaintiffs' witnesses as experts; Mr. Moore, however, had been in the plumbing and well-repair business in this area since 1948, and had actual knowledge of both wells at issue, as well as those on neighboring properties. He had also participated in construction of airshafts for mines. He was able to state positively that grouting pumped into drill holes in an airshaft could travel to plaintiffs' property and damage its wells. He had seen it happen before. He had also seen pollutants travel five miles through percolation without any pressure pumping at all. Mr. Moore was thus qualified to speak on issues important to the case, and we see no objection to his admission as an expert, a decision very much within the trial judge's discretion.

■ Defendant also claims that hypotheticals were not substantiated because of misuse of the term "fracking" and because witnesses varied the pressure used in the process from 200 pounds to 2,000 pounds. Examination of the Record, however, shows that where a hypothetical was stated, it merely discussed forcing a substance under pressure into the airshaft. Neither the precise term of "fracking" nor the poundage was mentioned at that stage of the testimony. In general, all witnesses agreed as to the process used, though one of defendant's witnesses preferred to characterize it as a "partial sealing" of the shaft and not as "fracking."

Similarly, defendant's claim that migration of grout "from actual inspection underground" did not exceed 25 feet (R. Brief of Appellant, p. 13) is vastly over-stated. The witness merely said the following:

> We have gotten into a shaft that clearly shows that at a 650 feet depth or 640 foot depth this has migrated only 20 feet from the edge of the shaft. (N.T. 246a)

What was done to establish this fact is unclear, but "actual inspection underground" is a claim of the Brief, not

the witness. Further, inspection of "a" shaft may have some marginal relevance but is a far cry from defendant's claim of proof that inspection of grout hole # 4 provided the information. Also, as the wells in question were only 90 feet or so in depth, the importance of a figure on migration of grout at 650 feet is questionable.

Without examining every contention of defendant in this opinion, we can state that its objections to the witnesses and to the sufficiency of the evidence to support jury findings of liability on their part are not convincing. Both parties were permitted to present evidence in support of their contentions, and if the jury found the facts as presented by plaintiff to be true, we see no need to overrule the finder of fact.

■ Admittedly, the ground was not laid bare in an effort to trace the flow of grout at a depth of some ninety feet over an area of 600 feet of intervening ground. Such a requirement would be overwhelming financially, and physically disruptive to the neighborhood. There was plenty of evidence, however, from which a reasonable jury could deduce causation: the former twenty-five years of uninterrupted water supply; the physical proximity of the grouting operation to the ruined water wells; the timing of defendant's completion of its operations shortly before the resulting failure of the wells; the grout-like substance observed by witnesses in the muck removed from the well-bottoms; the similar damages sustained by other well owners in the near vicinity at the same time.

The plaintiffs' burden here is one of "a fair preponderance of the evidence." See *e.g. Johns v. Township of Shaler,* 240 Pa.Super. 129, 368 A.2d 339 (1976). Our business as a trial court upon review is:

> ... limited, in general, to determining whether there is evidence to support the verdict, especially where the trial court has refused to set it aside. 9 *Standard Pennsylvania Practice,* p. 433 and cases cited therein. (1962)

We determine that there was evidence to support a finding of causation in this matter, and this court will not reverse the finder of fact below, especially as the trial court did not.

The defendant's view that the injury, even if caused by its acts, is without remedy, presents a more difficult task of analysis. As noted above, analysis is proper under § 822 of the Restatement of Torts, 2d.

This action was brought under subsection (a) of 822, the theory that the invasion of plaintiffs' rights was *intentional* and *unreasonable*, and the jury necessarily found these elements in order to hold for the plaintiffs in the matter.

Since the verdict was in the plaintiffs' favor, the testimony must be considered in the light most favorable to them, and all reasonable inferences must be drawn in their favor. See *e.g. Reinhart v. Lancaster Area Refuse Authority*, 201 Pa.Super. 614, 193 A.2d 670 (1963). We must therefore review both the findings of "intent" and "unreasonableness" in a light most favorable to plaintiffs.

As to "intent", plaintiffs clearly are not contending that the activities of defendant amount to a deliberate plot to ruin their wells. They contend, however, and the jury obviously agreed, that defendant's acts came under the language of § 825(b) as set forth *supra*, and that defendant knew that the grouting injected was substantially certain to injure nearby wells, but nevertheless dug the airshaft and pumped in the grout.

In reviewing the record, we do find evidence to support that view: there is agreement that the process itself was specifically for the purpose of sealing off water flow; testimony showed that these two wells were not alone in showing effects from this particular airshaft grouting operation; a witness familiar with both the drilling of wells and the creation of airshafts stated flatly that he had seen this result before as a byproduct of the sealing process. A jury of reasonable persons could deduce that defendant company knew their grouting process would seal off water, that the

grout had traveled and destroyed wells in the past, and that in this instance the danger of that happening was indeed so substantial that, in effect, almost all neighboring wells were effected to some degree. Upon review we must agree that the testimony can support intent under the "substantial certainty" rule of § 825(b).

As to the finding that the invasion of plaintiffs' right to their enjoyment of their well-water was "unreasonable", we again turn to the wording of the Restatement of Torts 2d at § 829(a), as set forth *supra*, and the comment following it.

■ No one is contending that the mining of coal is not a useful activity, and airshafts are a necessary part of that activity as safeguards to the health of miners. "Unreasonable", however, is a term of art, a legal definition rather than a moral judgment on the good sense of a party. Utility of an act must be balanced against the bad effects resulting from that act in determining its reasonableness.

■ The harm to plaintiffs in the loss of both their wells was undeniably "severe," and we are inclined to agree with the finder of fact that the loss is "greater than they should be required to bear without compensation," "*regardless of the utility of the conduct.*" See § 829(a) and comment following. *supra.*

Case law further recognizes this principle, and has done so from an early date:

> . . . the defendant's right to injure another's land at all, to any extent, is an exception, and *the burden is always upon him to bring himself within it.*
>
> .    .    .    .    .
>
> Where conflict is irreconcilable, the right to use one's own must prevail, but it can do so without compensation where the resulting damage is *not avoidable at all, or only at such expense as would be practically prohibitory. Pfeiffer v. Brown*, 165 Pa. 267, 274–275, 30 A. 844, 846–46 (1895) (emphasis supplied); accord, *Collins v. Chartiers Val Gas Co.*, 131 Pa 143, 18 A. 1012, 6 LRA 280 (1890).

Defendant made no effort on the record to show that the damage inflicted was "not avoidable at all" or that it was avoidable "only at such expense as would be practically prohibitory." In fact, the whole thrust of its arguments was that its operations had not harmed plaintiffs' property, and that the legitimacy of its lawful use of its own property was unquestioned.

No testimony was offered to show that this location was the only possible place for an effective airshaft; no discussion of a lack of less destructive methods of waterflow prevention was placed on record; no claim of prohibitive expense in use of other methods or other locations was made.

■ In short, defendant made no attempt to fulfill its burden to prove that its acts were not avoidable at all or only avoidable at prohibitory expense. Once the plaintiff had met its burden of proof of causation by a preponderance of the evidence, Section 829A and case law agree that the burden shifts to the actor to defend its conduct as "reasonable." Defendant here did not meet its burden, and we affirm the jury's finding of intentional and unreasonable damage to plaintiffs, for which compensation is due.

■ Defendant's final allegation of error is that the trial judge wrongly instructed the jury that the mining rights clause in the plaintiffs' deed as incorporated from the deed of its predecessors in title had "nothing to do with the issue in this case." The reasoning of the trial judge in reaching this result does not coincide with our own, but we conclude that his decision to remove the deed from consideration was correct nevertheless, for the following reason:

The wording of the original deed dated 1921 is clearly based upon the supposition that the mining rights clause would come into effect at time of actual use of plaintiffs' property for coal-mining purposes:

All the coal ... within and underlying all that certain tract of land ...

> TOGETHER with the free and uninterrupted right to mine and remove any and all of said coal without being required to leave support for the overlying strataor surface ... and without being liable for damage for any injury to the said overlying land, or to the springs or water courses therein or thereon ... (R. "Indenture" dated 1921, 186a)

This wording protects the mining company from liability to the owner of the surface rights of the property during mining of coal rights under the property. It was never designed to fit the facts of this case, which as we have seen was tried on a theory of non-trespassory invasion of another's land from an adjoining property. The drafters of the document in 1921 doubtless envisioned that damage caused on the mining company's own lands could always be proved to be "reasonable" in view of the provable "utility" of coal production. Their sole concern was to protect the company from liability when direct damage was suffered by surface owners of the area under which they mined.

Our legislature, however, as mentioned by the lower court, has enacted the Bituminous Mine Subsidence and Land Conservation Act, 52 P.S. 1406.1 ff. Its wording clearly makes unlawful a great deal of the contractual language included in the 1921 Indenture which would otherwise free the mining company from liability for subsidence of land and injury to buildings thereon.

Additionally, § 1406.19 states that the act is remedial and is not to receive a strict or limited construction; § 1406.2 states that preservation of water supplies are a purpose of the act; and § 1406.4 forbids mine operations in a manner that will cause damage to dwellings. The balance of the unquestioned utility of coal mining and the reasonableness of the destruction it entails has undergone a change since 1921, and defendants will be held to liability where damage is "severe and greater than the other should be required to bear without compensation."

■ One last problem remains to be discussed. The lower court correctly stated the measure of damages in the charge to the jury:

> The measure of damages . . . is the cost of the remedy unless it exceeds the value of the property, in which case the value of the property is the measure of damages. Where the damage is permanent, the measure of damages is the difference between the value of the land before the loss or damage, and the value of it afterwards.
>
> (R. N.T. 237)

■ The lower court's opinion, reflecting upon the jury decision, also came to a conclusion on the verdict rendered:

> What the jury did, we must infer, was to find the damage permanent and the cost of restoration greater than the difference in value, and accepted the before and after values submitted in the testimony of Mr. Arnold. [Plaintiffs' real estate agent witness.]

We absolutely agree with the lower court's inference as to the workings of the jury's mind on that decision. Unlike the lower court, we cannot find foundation in the testimony to support such a conjunction of facts. True, Mr. Arnold opined that the lost value would be to the amount of $32,500 *if there were no water on the property.*

As far as we can determine, not a single witness for either party ever stated that restoration of the wells to working order was impossible or even unlikely. The testimony of plaintiffs' own witnesses guaranteed a good supply of water at well # 2 for $1,000 to $2,000, plus modest maintenence costs. Neighbors had also shortened and/or deepened wells to reestablish supplies of water, at, presumably, the local estimated costs of $1,200 to $1,500; therefore, an assumption that plaintiffs would not be able to restore or replace well # 1 has only slightly more credible testimony to support it than the assumption that well # 2 could not be made potable. As to the necessary assumption that the entire property would remain without water and that damages should be based on a salvage value, we find that assumption incredible. The evidence simply does not support the ver-

dict. The jury's findings on that measure of damages should not have been permitted to stand.

## CONCLUSION

We therefore affirm the holding of the court below insofar as it held the defendants liable for damage sustained by these plaintiffs to their wells; however, as the evidence does not support a finding of total, permanent loss of water, the award of $32,500 is excessive. The correct measure of damages is remedial, and the case is remanded solely for determination of a reasonable sum for consequential damages and costs of restoration.

Affirmed as to liability, reversed and remanded as to damages. We do not retain jurisdiction.

PRICE, J., notes dissent.