Hannum et al. *v.* Gruber et al., Appellants.

418

Argued January 12, 1942. Before Maxey, C. J.; Drew, Linn, Stern, Patterson, Parker and Stearne, JJ.

*Otto Kraus, Jr.*, with him *Edward L. Frater, Vincent P. Desmond* and *E. P. Balderston*, for appellants.

*Donald H. Hamilton*, with him *Edward D. McLaughlin*, for appellees.

Opinion by Mr. Chief Justice Maxey, March 22, 1943:

This appeal is from a decree enjoining an alleged nuisance created by the operation in the City of Chester of a dye works by the defendants. The complainants in the bill for the injunction are property owners and tenants in the neighborhood of the Works.

The nuisance complained of is the discharge from the defendant's operations on St. Charles Place of black smoke, soot and fumes into the atmosphere, which fall upon the complainants' properties and invade their homes, and the emitting of loud and continuous noises at night time interrupting the sleep and rest of the plaintiffs. The answer denied the allegations as to smoke, soot and fumes and loud and continuous noises at night

time coming from the defendants' Works, and averred that the facts in the plaintiffs' bill "are exaggerated because . . . the nature of the defendants' business is the cleaning and dyeing of clothes, many of which are of light colors . . ., would naturally be affected if the condition so alleged existed." The defendant further averred "that the said district . . . is a manufacturing district, and that the air is impregnated with such matter as is naturally incidental to a manufacturing neighborhood, and that there is noise necessarily incidental to a manufacturing neighborhood."

The action was instituted on January 29, 1936, and the cause went to hearing on the bill and answer on January 9, 1937. Testimony was taken from time to time and on October 1, 1938, the Chancellor filed an opinion in which he set forth certain findings of fact and conclusions of law and entered a decree nisi "that the bill be retained for a period of ninety days from this date. At the expiration of that period, the plaintiffs may elect to present additional evidence, at further hearings, for the purpose of showing how the defendants' plant is then operated, with reference to the matters complained of in this bill. At such further hearing . . . the defendant may show what it has done to remedy the nuisance . . ." On January 4, 1939, the plaintiffs filed an election to present additional evidence, and when the matter came up for hearing on February 8, 1939, it was continued pending the completion of improvements "to satisfy everybody." On September 18, 1940, the plaintiffs called the matter for further hearing charging that the nuisance was not abated.

Many witnesses testified on both sides of the controversy and the testimony is very contradictory. Thirteen persons (property owners and tenants) many of whom have lived in the neighborhood for many years, testified in behalf of the defendants, that "they were not affected by any smoke fumes or noise from the Chester Dye Works." Some stated they had washings every

day which were not discolored, including waitresses' uniforms and towels used by a chiropodist. Others had young children whose sleep was not interfered with in the least by the operation of the plant. A witness for the *plaintiffs* who had appeared at prior hearings and who lived on the south side of Seventh Street, stated the smoke did not disturb her in any degree.

Five employees of the defendants showed that no fumes could affect food since they for years had eaten their lunch on the premises. These lunches were kept within a few feet from the dye cleaning room where the solvent was used. Nor did any of the employees ever suffer any physical bad effect by the alleged fumes. School and church authorities in the immediate vicinity made no complaint as to the conditions prevailing there.

But the Chancellor found as a fact (and there is evidence to support these findings) "That the defendants so operated their furnaces that there was discharged from the stack for a long time prior to the filing of the bill in equity, and thereafter, a heavy, black, sooty smoke and offensive odors and gases which the plaintiffs and others were compelled to inhale and which invaded the premises of the plaintiffs, settling on window sills, walls, draperies, curtains, linens, rugs, carpets, furniture and food stuffs. That the dryers, washers, pressing machines, pulleys and shafting, machinery and other mechanical appliances, both before and after filing of the bill of equity, were so operated as to cause loud and continuous noises consisting of metal grinding and knocking against metal, the shrill blowing off of steam, thumping and knocking and other noises which were carried to the dwellings of the plaintiffs and others in the neighborhood so that their sleep was disturbed, they were unable to enjoy the usual comforts of their home and they were in other ways injured and annoyed. That the defendants in the conduct of their business used the cleaning substances or solvent, both before and after the filing of the bill in equity, in such a manner that

pungent odors escaped and were carried to the dwellings of the plaintiffs and others in the neighborhood, causing headache, dryness of the throat and nasal passages, coughing, nausea and other physical discomforts, and also contaminating food stuffs, which prevented the plaintiffs from enjoying the usual comforts of their homes."

The building now occupied by the defendants was formerly used as a roofing and a sheet metal shop in which machinery incidental to the sheet metal business was installed and operated. It is only a few blocks from the main tracks of the Maryland Division of the Pennsylvania Railroad upon which both electric and steam locomotives run. Across the street from the defendants Dye Works is the Philadelphia Electric Company substation, and adjoining the next lot thereto, is the Old Berry Plant and the Smedley Junk Yard. Between Crosby Street and Madison Street, which is just one block west of Crosby Street, is the Old Bowers Mill and the Chester Plating Company, and on the square between Madison Street and Upland Street, which is just one block west of Madison Street and Sixth Street and Seventh Street, are two machine shops, a foundry plant and a pattern storage constituting part of the Weatherill plant of the Sun Shipbuilding Company. In the immediate vicinity of these Dye Works there are at least two garages and parking lots and small retail shops. The Dye Works is located in a district zoned by the authorities of the City of Chester as "medium industrial".

The Chancellor entered a decree nisi restraining the defendants "from operating their plant (cleaning and dyeing business) in such a manner as to emit from said plant smoke, odors, gases, smudge, noises and vibrations which are unnecessary and unreasonable under the circumstances and which can be eliminated by the efficient operation of their business of cleaning and dyeing and by the installation of the most effective, reasonably avail-

able devices for the reduction of smoke, odors, gases, smudge, noises and vibrations in their place of business. . . . and from operating and conducting [the] business . . . between the hours of nine o'clock P. M. and six o'clock A. M., . . . on week-days, and at *no time* on what is commonly called the Sabbath."

Exceptions were filed by the defendants to the adjudication of the Chancellor and these exceptions were dismissed by the court below in an opinion written by the Chancellor.

The appellants complain that the decree is too broad, and that its effect, if it remains in force, is to compel the defendants to cease all further operations of their dry cleaning plant. They contend that the testimony shows that they have already adopted all reasonable and available devices to minimize the cause of the complaints, at an approximate cost of $4500; that the Chancellor found as a fact that "the defendants installed an Iron Fireman automatic stoker, for the purpose of eliminating any smoke," and "that this appliance installed at a cost of $1,802.00, is the best possible appliance to eliminate smoke and is so constructed and operated;" and that the testimony showed that "when it is necessary to clean the fire, which is about once every eight to twelve hours, it will smoke for about one to three minutes. The rest of the time when the stoker is in operation you cannot see the products of combustion. There are some products of combustion coming from the chimney but not visible to the naked eye;" and that there is no evidence of any other available and reasonable devices or possible means to eliminate the smoke and the fumes.

The present case is governed by the principles laid down by us in the case of *Ebur v. Alloy Metal Wire Co.*, 304 Pa. 177, 182, 155 A. 280. We there said: "The courts have found it difficult to lay down any precise and inflexible rule by the application of which it can be determined that a plaintiff in a given case is entitled

to relief by injunction against smoke, fumes and noises emitted in the vicinity of his residence. It has been said that a 'fair test as to whether a business lawful in itself, or a particular use of property, constitutes a nuisance, is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case.': 46 C. J. 655. It has also been said: 'Whether the use is reasonable generally depends upon many and varied facts. No hard and fast rule controls the subject. A use that would be reasonable under one set of facts might be unreasonable under another. What is reasonable is sometimes a question of law, and at other times, a question of fact. No one particular fact is conclusive, but the inference is to be drawn from all the facts proved whether the controlling fact exists that the use is unreasonable': 46 C. J. 656. No word is used more frequently in discussing cases of this kind than the word 'reasonable', and no word is less susceptible of exact definition. What is reasonable under one set of circumstances is unreasonable under another. Custom itself has much to do with determining what is reasonable. Noises which in the preindustrial era would have been considered intolerably unreasonable are now tolerated as reasonable. The noise and smoke of railroad trains frequently passing human habitations is not now considered unreasonable, although an equal amount of noise and smoke would doubtless at an earlier time have been considered so. That a certain amount of smoke, fumes, gases and noises will necessarily be produced and emitted by manufacturing plants is inevitable, but that persons who dwell near such plants, like persons who dwell near railroads or on busy city streets, must put up with a certain amount of resulting annoyance and discomfort is self-evident. The prosperity of an industrial community depends on its industrial activities and it would be inconsistent with sound public policy to prohibit these

activities at the behest of a comparatively few who are annoyed thereby. Every form of industrial activity has its disagreeable factors. Industries, like individuals, have 'the defects of their qualities'. In mining and manufacturing communities people must expect that their homes will be more difficult to keep clean than if they lived in an agricultural community. A certain amount of noise also is inseparable from industrial activity. The burdens of prosperity must be taken with its benefits."

In the case just cited, we also said that "The utmost protection the plaintiffs are entitled to from smoke, odors, gases, smudge and noises from the defendant's plant is from these things in amounts that are unnecessary and unreasonable under the circumstances. . . . If the defendant's plant is emitting more of these annoying things than other plants in the same business and of equal output are emitting, there is something wrong with the equipment and management of the defendant's plant and the smoke, odors, gases, smudge and noises are unnecessary and unreasonable. If devices or more efficient management which would reduce the smoke, odors, gases, smudge and noises and vibrations issuing from its plant are available to the defendant at a reasonable expense, it is the duty of the defendant to secure such devices or management and if it fails to do so, the smoke, noises, etc., emitting from its plant may be regarded as unnecessary and unreasonable." In the instant case the Chancellor found that the belt driven extractors were removed and electrically operated ones installed for a cost in excess of $2335.00, thus "eliminating the noise caused by mechanical driven pulleys", and that the receptacle into which lint and other refuse had formerly been blown was removed and piping installed which carried such material to a container entirely removed from the vicinity of the plaintiffs' property. The Chancellor said in his opinion: "The defendants showed also that since the filing of the bill, an automatic stoker and return

system was installed at a cost of one thousand, eight hundred and five dollars ($1,805.00). Shutters were built along the side wall, which were kept closed. A belt driven extractor was removed and an electrically operated one installed at a cost of three hundred thirty-five dollars ($335.00). Another belt driven extractor was replaced by a motor driven one for a cost in excess of two thousand dollars ($2,000.00). This eliminated the noise caused by mechanical driven pulleys."

The Chancellor also found that "Since the hearing held September 18, 1940, the defendants brought from New York a combustion engineer to give instructions on the proper use of the automatic stoker. An extensive cleaning of this apparatus was made and all openings sealed so that there would be a minimum amount of smoke. Under his direction, the stack was again raised, this time to a height of seventy-four feet, at a further cost of four hundred five dollars ($405.00). Following his advices, a high-grade anthracite coal was used instead of a semi-bituminous fuel. All the belt driven machinery in the wash room which had been located on the north side nearest the plaintiffs' property was removed to the opposite side of the defendants' property. Three windows of the dye cleaning room facing East Seventh Street were completely enclosed with two thicknesses of brick. Prior to the hearing, a receptacle on the roof of the defendants' plant, into which lint and other refuse had formerly been blown, was removed. In its place, piping was installed, which carried such material to a container entirely removed from the vicinity of the Seventh Street properties." The defendants have installed devices which should eliminate the smoke; they changed from soft coal to anthracite; they raised their stack to a height of 72 feet, and also have installed motor driven instead of belt driven machinery and have removed all machinery from the side of the building contiguous to plaintiffs' backyards to the other side of their building to eliminate the noise. Plaintiffs have not

shown anything left undone by defendants which should have been done.

In *Collins v. Wayne Iron Works*, 227 Pa. 326, 331, 76 A. 24, this court said: "No one is entitled to absolute quiet in the enjoyment of his property; he may only insist upon a degree of quietness consistent with the standard of comfort prevailing in the locality in which he dwells. Here, in measuring the relief to be given, the close proximity of the railroad and the noise of the great number of trains that pass over it, should be considered as affecting the standard of comfort normally prevailing in the locality in question. In a case like the present where the annoyance arises from the conduct of a business which is not a nuisance per se, a strong effort should be made to conserve the rights of all parties; and an important question is, Can the noise by any reasonable means be so moderated as to accord with the degree of quietness the plaintiff has a right to enjoy; and, if it can, by what means?" In *McCaffrey's Appeal*, 105 Pa. 253, this court said: "A person who resides in the center of a large city must not expect to be surrounded by the stillness which prevails in a rural district. . . . The aid of a court of equity may be invoked to keep annoying sounds within *reasonable limits.*" (Italics supplied.) Both quotations are appropriate here. The defendants have attempted by every available "reasonable means" to moderate the noise and the other disagreeable things complained of.

The 40th and 41st assignments of error which go to the form and substance of the decree are sustained.

We will not, however, order the dismissal of plaintiffs' bill. The court of equity below having jurisdiction of the parties and the subject matter, will retain this bill, and may receive further testimony as to possible means of so treating the smoke, fumes and noise as to reduce them and may thereafter make any such specific order as the facts justly call for. For this purpose, leave is given to the court below to take further evidence,

and we call the court's attention to *McCaffrey's Appeal,* supra, where the court below "appointed three persons as experts to visit the premises and report". It would be entirely proper in this case for the court below to avail itself of the report of persons qualified to examine defendants' plant and to determine whether defendants have done all that can reasonably be demanded of it to reduce the annoyances complained of.

The decree of the court below is reversed, costs to be paid by appellees.