Reid *v.* Brodsky, Appellant.

464

Argued April 29, 1959. Before BELL, MUSMANNO, JONES, COHEN and MCBRIDE, JJ.

 reargument refused December 30, 1959.

*Laurence H. Eldredge,* with him *Samuel Moonblatt,* for appellants.

*Leonidas A. Allen,* with him *Matthew W. Bullock, Jr.,* and *Bullock and Allen,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 21, 1959:

These appeals present two principal questions: (1) should a court of equity enjoin the operation of a duly licensed taproom-restaurant located in a residential district because of unseemly noise and indecent conduct on the part of its patrons outside the licensed premises?; (2) do residents in the immediate neighborhood of the taproom-restaurant have the right to peacefully picket for the purpose of discouraging and dissuading the public from patronizing such restaurant?

Appellant Brodsky, owner and/or operator of several licensed restaurants in Philadelphia, purchased the premises known as 3620 North 19th Street and

located at the northwest corner of 19th and Pacific Streets in the Tioga-Nicetown section of North Philadelphia for the purpose of operating a taproom-restaurant wherein liquor and malt or brewed beverages would be sold for consumption on the premises. Brodsky secured permission from the zoning authorities of the City of Philadelphia[1] and from the Pennsylvania Liquor Control Board for the transfer of a restaurant liquor license to this new location.[2] In connection with the purchase of the premises, the remodeling and improvement of the building and the transfer of the liquor license, Brodsky spent approximately $50,000.[3]

The taproom-restaurant opened for business on March 31, 1958. Immediately thereafter the appellees began and have continued to indicate their opposition to the use of the premises as a taproom-restaurant by picketing and by the display of signs on their residences urging the public not to patronize the restaurant. This picketing and display of signs has resulted in a financial loss to appellants' business, a loss reflected in a reduction of weekly gross receipts from $1,000 during the first week to $125 during the eleventh week of operation.

Prior to the opening of this taproom-restaurant and on March 18, 1958, the appellees—individual resi-

[1] The fact that the approval of the zoning authorities was given to the establishment of this restaurant does not affect the power of a court of equity to enjoin it as a nuisance: *Mazeika v. American Oil Co.*, 383 Pa. 191, 194, 195, 118 A. 2d 142; *Perrin's Appeal*, 305 Pa. 42, 51, 156 A. 305.

[2] The appellees—residents in the immediate neighborhood of the proposed restaurant—protested this transfer and were given an opportunity to present their views to the Board. Under *Obradovich Liquor License Case*, 386 Pa. 342, 126 A. 2d 435, such protests were of no avail.

[3] Whatever may have been spent is immaterial since Brodsky, aware of appellees' determined opposition, took a calculated risk.

dents of the neighborhood acting on their own behalf and on behalf of other residents—instituted an equity action in Court of Common Pleas No. 6 of Philadelphia County to enjoin the opening of the taproom-restaurant upon the theory of an anticipatory nuisance. During the pendency of that proceeding the taproom-restaurant opened for business and appellees then filed an amended complaint upon the theory that the operation of the taproom-restaurant constituted under the circumstances a nuisance in fact. Prior to any disposition of that proceeding the appellants Brodsky and Lane Bar, Inc.[4] instituted an equity action which sought to restrain appellees from boycotting and picketing the restaurant. Both equity actions were consolidated for trial and, after final hearing, the court below entered two decrees: one decree enjoined the operation of the taproom-restaurant and the other decree dismissed the equity complaint which sought to restrain the boycotting and picketing. From the entry of both decrees these appeals were taken.

In determining these appeals we recognize that the operation of a restaurant in which liquor and malt or brewed beverages are sold, duly licensed by the Pennsylvania Liquor Control Board, is a lawful business and, even though located in a residential district, is not a nuisance *per se*: "Nuisances", 46 C.J. §265, p. 722; "Nuisances", 66 C.J.S. §75, (2), p. 822. Unless the operation of this particular taproom-restaurant business constituted a *nuisance in fact* it cannot and should not be enjoined.

Our initial inquiry, therefore, is to determine whether the proof of record supports the conclusion that the

---

[4] While not entirely clear of record, it would appear that Brodsky sold his interest to Lane Bar, Inc., in which corporation Wilbert E. Martin and Shirley Martin were the principal stockholders.

operation of this taproom-restaurant constituted a nuisance in fact.

In pursuing this inquiry we are bound to adhere to the well-recognized rule that the findings of fact made by a chancellor and approved by the court en banc are controlling on appeal provided such findings are supported by evidence, are not manifestly erroneous and were not arbitrarily and capriciously made: *Oreovecz v. Merics*, 382 Pa. 56, 114 A. 2d 126; *O'Neill v. Keegan*, 376 Pa. 606, 103 A. 2d 909; *Teats v. Anderson*, 358 Pa. 523, 58 A. 2d 31; *Burke v. Harkins*, 296 Pa. 414, 146 A. 94.

The chancellor found, inter alia, that (1) the appellant Brodsky, a longtime restaurant owner and operator, bears an excellent reputation and has never been cited for any violation of the liquor control law; (2) with certain minor exceptions, the area in which the taproom-restaurant is located is exclusively residential; (3) the area, occupied predominately by persons of the colored race, is a quiet, conservative residential neighborhood, with well-built and well-kept homes, and constitutes an environment conducive to quiet and peaceful living, one particularly suitable in which to raise children; (4) south of this area is a district sometimes termed a "jungle area" wherein congested living and slum conditions prevail and wherein there exists a high incidence of crime, vice and juvenile delinquency; (5) a majority of the patrons attracted to this taproom-restaurant come from the so-called "jungle area".

The chancellor then found that the operation of this taproom-restaurant over a period of approximately eleven weeks had resulted in conduct on the part of its patrons which threatened to destroy the character of this hitherto quiet, peaceful and residential community. Patrons entered and left the restaurant in an intoxi-

cated condition; loud and unseemly noise, both from its patrons and its juke box, on occasions emanated from the restaurant itself; intoxicated persons departing from the restaurant utilized neighborhood properties and alleys for toilet purposes; obscene, vulgar and profane language was employed by patrons entering and departing from the restaurant; indecent, immoral and vulgar conduct took place in parked cars outside the restaurant; on one occasion a porch in the vicinity was utilized for sexual misconduct; contraceptive devices were found scattered in and about the area; on occasions patrons engaged in altercations outside the taproom. Not only did such conduct occur in front of adult residents of the neighborhood but at times in the presence of children who passed the restaurant en route to and from both a parochial and a public school located in the neighborhood.

Our examination of this record—a record replete with testimony as to conduct on the part of the taproom-restaurant patrons shocking and repugnant to the sensibilities of decent persons—finds full and complete justification in support of the findings of the chancellor in this respect. It is highly significant that the conduct depicted by the testimony took place over a period of almost eleven weeks, both during the daytime and nighttime, and was of such nature that it could not have escaped appellants' attention, yet the record indicates no action on appellants' part to correct or prevent the occurrence of such conduct.

In *Hannum et al. v. Gruber et al.*, 346 Pa. 417, 423, 31 A. 2d 99, 102, we said: " 'It has been said that a "fair test as to whether a business lawful in itself, or a particular use of property, constitutes a nuisance, is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the man-

ner and under the circumstances of the case." ': 46
C. J. 655. It has also been said: 'Whether the use
is reasonable generally depends upon many and varied
facts. No hard and fast rule controls the subject. A
use that would be reasonable under one set of facts
might be unreasonable under another. What is reason-
able is sometimes a question of law, and at other times,
a question of fact. No one particular fact is conclu-
sive, but the inference is to be drawn from all the facts
proved whether the controlling fact exists that the use
is unreasonable.': 46 C.J. 656."

Appellants' use of this property for taproom-res-
taurant purposes was unreasonable in this locality
and under the other circumstances involved. It should
have been obvious to appellants that the establishment
of the taproom-restaurant in this quiet residential
neighborhood would seriously interfere with the resi-
dential character of the area and with appellees' en-
joyment of their properties. The practically unani-
mous opposition of all the residents of this district
should have made evident to the appellants at the out-
set that whatever patronage the taproom-restaurant
would enjoy would have to come from other areas.
Once the taproom-restaurant began operation it became
evident that many of its patrons came from the con-
gested slum area and that the taproom-restaurant had
become a magnet of attraction to many persons whose
standards of conduct were completely foreign to those
of the decent, law abiding residents of the neighbor-
hood. The public conduct of the patrons of this tap-
room-restaurant could not help but offend the sensi-
bilities of the residents of this area, destroy the char-
acter of the neighborhood and seriously interfere with
appellees' enjoyment of their homes.

Appellants argue that most, if not all, of the of-
fensive conduct took place not *within*, but *without*, the

restaurant premises and for such conduct appellants should not be held responsible. Until the establishment of this restaurant in the area such offensive public conduct was unknown; it was the establishment of the business within this area which attracted those persons whose conduct so mortified and disgusted the residents of this neighborhood. The factor which introduced this conduct into the area was the establishment of this taproom-business with its attraction for undesirables from other areas; assuming *arguendo,* that appellants could not control the conduct of their patrons outside the premises, is that any excuse for the continuance in business of this establishment whose existence is solely and primarily responsible for the attraction of those persons into this neighborhood whose conduct so offends the morals of the property owners situated therein? Assuming that appellants could not control the conduct of their patrons, is this business which brings into the area by way of attraction those persons whose conduct is reprehensible to be permitted to be operated simply because it has been given an aura of respectability and legality by the issuance of a liquor license? The conduct which has disturbed the peace and quiet of this residential area and affronted the sensibilities of appellees endeavoring to maintain in this urban area a decent, clean and wholesome environment in which to live and rear their families directly resulted from the operation of this taproom-restaurant. The only practical manner in which this area can be protected from this unwholesome conduct is through a cessation of the operation of this business.

Other jurisdictions presented with similar problems, have reached almost identical results: *Barrett v. Lopez,* 57 N.M. 697, 262 P. 2d 981; *Johnson et al. v. Nora* (La. App.), 87 So. 2d 757; *Lawson v. Arkansas*

(Ark.), 288 S.W. 2d 585; *Green et al. v. Asher*, 10 Ky. L. Rep. 1006, 11 S.W. 286; *Kissel v. Lewis*, 156 Ind. 233, 59 N.E. 478; *Haggart v. Stehlin*, 137 Ind. 43, 35 N.E. 997; *Koehl v. Schoenhausen*, 47 La. Ann. 1316, 17 So. 809; *Sipe v. Dale et al.* (Okla.), 80 P. 2d 569.

*Molony et ux. v. Pounds et ux.*, 361 Pa. 498, 64 A. 2d 802, relied upon by appellant, is not apposite. The circumstances therein presented are entirely dissimilar from those herein presented.

Our examination of the instant record and all the circumstances therein delineated convinces us (1) that appellants' business as conducted amounted to a nuisance in fact and in law and (2) that unless the operation of this taproom-restaurant be enjoined in this residential area the conduct complained of will continue. Therefore, the decree of the court below in this respect is affirmed.

In view of our decision that the operation of this taproom-restaurant be enjoined it is unnecessary for us to determine the legality of the picketing and display of signs by appellees. The objective of the picketing—the cessation of operation of the restaurant—having been judicially determined it would be purely academic to engage in a discussion of the legality of the picketing which has now ceased.

The decree entered to No. 693 March Term, 1958 is affirmed and the appeal from the decree entered to No. 1736 March Term, 1958 is dismissed as moot.

Mr. Chief Justice JONES and Mr. Justice BOK took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE MCBRIDE:

This case involves two appeals. Appeal No. 101 is by the proprietors of the restaurant from the decree of

the court perpetually enjoining them from operating a restaurant despite their having been granted a liquor license by the Liquor Control Board. The second appeal, No. 102, is from the action of the court below refusing to restrain appellees from picketing and boycotting their restaurant.

The decision of this Court treats the matter as if it were only one case and, having answered the contentions in No. 101, says that it is unnecessary to discuss the contentions in No. 102. I do not agree with this disposition. This is a separate appeal and must be passed upon. There does not seem to me to be anything in the record that would justify our dismissal of it as being moot. The picketing and boycotting was going on even during final hearing in the court below.

The premises in question is located in an A-Commercial zone and in such zone a restaurant is permitted. The plaintiff, Tioga-Nicetown Civic League, is an association of persons residing within an area of approximately one square mile adjacent to the restaurant.

It would appear that immediately following Brodsky's application for the transfer of the restaurant liquor license to its present location the neighbors, including plaintiffs, presented their objections to the Liquor Control Board. Those objections were not personal to Brodsky but were based upon the fear that the owner could not control patrons once they got outside the premises. The Liquor Control Board, following our decision in *Obradovich Liquor License Case,* 386 Pa. 342, 126 A. 2d 435, held that it was required by law to grant the transfer and so it was approved. The restaurant opened March 31, 1958 with an approximately $35,000 investment in premises and cost of improvements.

The original complaint filed by the plaintiff, Burnetta Reid, Individually and as President of the Tioga-

Nicetown Civic League, was filed on March 18, 1958, even before the restaurant was opened and recited that defendant was planning to open the premises as a taproom and that "in its very nature the taproom authorized for and which the individual defendant intends to open at premises here in question, will constitute a private nuisance . . . and a public nuisance." The theory of the complaint, as plaintiff says, is that "their case is based, not on the assumption that the taproom would be improperly operated by the individual defendant but that it is inherently a nuisance." This complaint was directed not only against Brodsky, the restaurant proprietor, individually, but also joined the Pennsylvania Liquor Control Board. Plaintiff thereafter filed an amended complaint against Brodsky as sole defendant.

Shortly after the restaurant opened signs appeared on various porches reciting "We Oppose the Tap Room at 19th & Pacific Sts. Don't Patronize It. The Block Organization." Picketing commenced at the same time and continued, without interruption, until the restaurant was forced to close. Brodsky not only had been warned to remove the restaurant but he and his wife received anonymous telephone calls at night at their home. The plaintiffs frankly admitted that the boycott and picketing was for the express purpose of compelling Brodsky to close up his restaurant and to destroy his business.

As to appeal No. 102: Boycotting and picketing depend primarily upon the legitimacy of the purpose sought to be accomplished by them. See Restatement, Torts, §765. See also *Watch Tower Bible and Tract Society v. Dougherty*, 337 Pa. 286, 11 A. 2d 147. In the *Watch Tower* case, the decision that the defendants were justified in withdrawing their patronage or threatening to do so and in inducing others to do likewise was based upon the legitimacy of their purpose.

When a labor union pickets an employer for the purpose of recognition, or for higher wages, and by placards seeks to tell the facts and enlist public support, the purpose is not to destroy the business for that would destroy the workers' jobs. In any case where that is its purpose the picketing is unlawful. In this case the picketing was not a means of communicating the nature of a dispute to the public. There was no demand for Brodsky to meet. There was nothing he could concede and thereby buy peace and thereafter carry on his business without further interference. The fixed purpose of the neighborhood was to extirpate this lawful business, to destroy it completely.

The law in Pennsylvania is well settled that peaceful picketing for an unlawful purpose may be prohibited by injunction. In *Sansom House Enterprises, Inc. v. Waiters & Waitresses Union,* 382 Pa. 476, 480, 115 A. 2d 746, Chief Justice STERN said: "There is no question but that, where picketing is for an unlawful purpose, it is no longer protected as an exercise of the right of free speech and may properly be enjoined." In *Anchorage, Inc. v. Waiters & Waitresses Union,* 383 Pa. 547, 551, 119 A. 2d 199, this Court went a step further when, again speaking by Chief Justice STERN, it said: "Picketing may be enjoined if *one* of its objects is unlawful even though not the sole object." The three justices who constitute the present majority have spoken for this Court to the same effect. See *Wortex Mills v. Textile Workers Union of America,* 369 Pa. 359, 366-67, 85 A. 2d 851; *Fountain Hill Underwear Mills v. Amalgamated Clothing Workers Union of America,* 393 Pa. 385, 392, 143 A. 2d 354; *Grimaldi v. Local No. 9, Journeymen Barbers, etc. et al.,* 397 Pa. 1, 153 A. 2d 214.

The appellees were guilty of unlawful conduct when they started picketing on or about April 1, 1958, with the intention to continue it until Brodsky's busi-

ness was destroyed, and to do so even though the court ruled that he was not maintaining a nuisance. For that reason alone the Chancellor should have denied them the equitable relief which they sought. That the purpose of the picketing was unlawful is readily apparent from even the most cursory reading of the record.

The appellee Reid was asked, "If the Court decided there was no nuisance would you continue your picketing?", and she answered "Yes". The witness Foster was asked, "If the Court should find in this matter that there is no nuisance, you nevertheless intend to continue your picketing?", and he answered, "I intend to picket until the place leaves, period". One neighborhood picket told Brodsky, "Jew Punk, we'll carry you out; we'll get you out of here one way or another; we'll bring you out feet first or we'll get you out, one way or another, feet first if possible." A second picket told him, "You need a police escort every night, not just one night, to go home." A third picket cursed him and said, "Brodsky, we're going to get you out of here by hook or crook."

The theory of the persons who later composed the Civic League, as well as its predecessor, was that the mere existence of the restaurant would attract an undesirable element. Courts cannot say that persons from undesirable neighborhoods may not enter more desirable ones and purchase liquor from duly licensed establishments. If this Civic League can prevent the operation of this lawful business simply because they do not like it they can prevent other persons from coming to live in their neighborhood because they do not like them. After they come the question is different. It is this aspect of the case which troubles me.

I feel deeply sympathetic to the efforts of the Civic League in this as well as all other neighborhoods in maintaining their properties and the character of the

neighborhood and in their efforts to eliminate or miti-
gate nuisances as they arise and to work cooperatively
with the police. Had they gone to the court below
without having first taken the law into their own
hands even before the restaurant opened and thus pre-
vented a man with a 24 year old record of good con-
duct from even having a fair chance to operate his
business, the case might stand upon a different foot-
ing. However, it seems to me that the neighborhood
is infected by a slight touch of anarchy. No matter
how laudable their purpose may be the legislature has
put control of the liquor traffic, licensing, operating,
revocation, suspension of licenses, in the Liquor Con-
trol Board. The people of the neighborhood, having
failed to make their protest succeed because of the
mandatory provision of the Liquor Control Act took
the law into their own hands. The violence that sub-
sequently came about may well have been partly due
to the resentment of the patrons of the restaurant to
the picketing itself. The well recognized equitable
principle that he who seeks equity must do equity is
peculiarly applicable here.

As to appeal No. 101: The decree of the lower court
rests solely upon what the patrons did before they got
to the restaurant and also what they did after they
left it. The court below found that the presence of the
restaurant, under the circumstances in which it op-
erated, constituted an offensive nuisance. I cannot ig-
nore, however, the fact that it never had a chance to
be otherwise. The boycotting and picketing commenced
before the occurrence of any misconduct which is said
to constitute the nuisance and may well have been the
cause for such misconduct. While it is clear that a
restaurant proprietor may be under a duty not to sell
liquor to persons and send them forth into the streets
so that they will commit trespasses, nevertheless, he
cannot be held to the high degree of policing the streets.

That is obviously the function of the police department and as to persons who commit such trespasses before they enter his premises we held in *Molony v. Pounds*, 361 Pa. 498, 504, 64 A. 2d 802, that there is no duty on a tradesman to control the conduct of persons who have not yet entered his establishment. The sale of liquor is not now an outlaw business in Pennsylvania and while the proprietor exercising the privilege of a restaurant liquor license is under a higher decree of care in the conduct of his business than an ordinary merchant, I do not see how equity can step in and exercise what are essentially the duties and prerogatives of the Liquor Control Board. Equitable power is statutory and so is that of the Liquor Control Board. Although the court below describes the persons who entered the restaurant as patrons, there is no evidence that any of the persons guilty of misconduct before entering the restaurant or after leaving it purchased liquor on the premises or that any of this offensive conduct came about from an undue consumption of liquor upon the premises. If such is the case this can, of course, be remedied by recourse to the Liquor Control Board.

With respect to the Chancellor's finding that Brodsky *"permitted* persons of the character who apparently frequented such establishments in this area to patronize the Star Dust", it may be pointed out that Brodsky could not, without violating the law, have excluded any person unless he was visibly intoxicated, or insane, or a minor, or a habitual drunkard, or a person of known intemperate habits, or was a person of ill repute, a known criminal or a prostitute. Such persons are specified in the Liquor Code of 1951, P. L. 90, §493.

In order to be the legal cause of a nuisance it is not enough that the actor's conduct be " a substantial factor in bringing about the harm"; it is also neces-

sary to find that any intervening force which immediately produced the harm is not a superseding cause: Restatement, Torts, §440. In the present case, all that Brodsky did was to open a restaurant which caused nobody any harm. All the harm was brought about by intervening forces, i.e., the activities of some of the persons who visited this business. Most of the offensive conduct was criminal misconduct on their part, and ordinarily intentionally tortious or criminal acts do operate as superseding causes: Restatement, Torts, §448.

In addition, I do not see how the restaurant proprietor, apart from not being a legal cause of the nuisance, is a tortfeasor. The operation of the restaurant was not in itself negligent, reckless or an ultra-hazardous act, nor do I believe the proprietor intentionally and unreasonably caused the harm to the neighborhood of which it complains. Surely there is no proof that Brodsky intentionally and unreasonably caused wrong-way driving on 19th Street, repeated urination in an alley, and sexual misconduct on a porch a half-block away. Intentional harm occurs only where one acts with the purpose of bringing about the result which follows or where one does an act knowing that certain harm will result from his conduct.

Counsel for Appellant puts two hypothetical cases to us. 1. Assume that A, a reformed ex-convict, desirous of earning an honest living, opens a delicatessen store at 3620 North 19th Street, Philadelphia. He behaves himself with complete propriety, but many former prison mates and underworld characters come to visit him. On various occasions some of these visitors, while standing in front of the delicatessen store, engage in shooting at each other. The neighborhood is greatly disturbed by the influx of such an undesirable element which engages in brawling and profanity, and puts the neighborhood in fear of greater evil to come.

Would any court hold that the delicatessen proprietor was maintaining a nuisance and order him to close his doors and go elsewhere?

2. A negro purchases a home in a white neighborhood. Rowdy white elements who live ten blocks distant converge on this house and howl and yell and greatly disturb the neighborhood. Negro visitors engage in fighting with the whites who endeavor to prevent them from entering the house. Is the negro who has purchased the home for lawful residential purposes, and thereby created a situation in which the conduct of third persons is highly offensive and disturbing to the neighborhood, guilty of maintaining a nuisance by continuing to live in his new home? Would any court order him to move out in order to preserve neighborhood peace, as the Chancellor ordered Brodsky to move out in this case? In such circumstances should the court not limit itself to controlling the objectionable misconduct?

To visit upon this lawful business the penalty of extinction because of community disapproval seems to me to flout the mandate of the legislature and the decision of the Liquor Control Board which acted in accordance with the opinion of this Court in the *Obradovich* case, *supra*.

I dissent.

Mr. Justice COHEN joins in this dissenting opinion.