## Reiff v. Brodsky

Before Forrest, P. J., Honeyman and Quinlan, JJ.

*Leonard F. Markel, Jr.*, for plaintiff.
*Charles Blasband*, for defendant.

HONEYMAN, J., January 8, 1964.—On April 2, 1958, plaintiff entered into a written agreement of sale with defendant for the purchase of a building located at 3620 N. 19th St., Phila., Pa., together with a restaurant and taproom business including a restaurant liquor license located thereon. On June 16, 1958, title to the real estate was conveyed to nominee of plaintiff, B.I.D.Inc., while the restaurant and taproom business including the liquor license was transferred to Lane Bar, Inc., also the nominee of plaintiff. At this time a consideration of $46,500 was paid to defendant, of which $10,000 was for the real estate and $36,500 was for the purchase of the restaurant and taproom business. Subsequently thereto, to wit, July 3, 1958, plaintiff and defendant executed another written agreement

whereby the parties "intending to be legally bound", mutually covenanted and agreed, inter alia, that:

"1. In the event that the Courts issue a Decree closing the restaurant and barroom at 3620 North 19th Street, Philadelphia, Pa., as a result of the present legal action pending before the Court of Common Pleas No. 6, upon which hearings were held before Judge Flood on June 19 and 20, 1958, BRODSKY agrees to assume one-half of the loss that shall be suffered by REIFF after all of the assets, including the building, restaurant liquor license, furniture, fixtures and equipment, have been liquidated."

An injunction closing said restaurant and barroom was granted by the Court of Common Pleas No. 6 of Philadelphia, March term, 1958, no. 693, and an appeal taken in the name of Brodsky as owner was denied by the Pennsylvania Supreme Court in a decision handed down on October 25, 1959, said decision being recorded in Reid v. Brodsky, 397 Pa. 463. An appeal for reargument was refused on December 30, 1959.

In the agreement of July 3, 1958, following the above quoted paragraph, the parties incorporated a formula to be applied in order to determine how much the defendant was obligated to pay plaintiff. This formula is as follows:

"The formula for ascertaining the loss shall be as follows:

| | |
|---|---:|
| "REIFF'S purchase price | $46,500.00 |
| BRODSKY's costs | 40,000.00 |
| BRODSKY'S profit | $ 6,500.00 |
| REIFF'S costs | $46,500.00 |
| Liquidation receipts | 30,000.00 |
| Net loss to REIFF | $16,500.00 |

"Brodsky's profit of Six Thousand Five Hundred Dollars ($6,500.00) shall first be deducted from

REIFF'S loss, leaving a net loss of Ten Thousand Dollars ($10,000.00), of which BRODSKY shall assume Five Thousand Dollars ($5,000.00) and REIFF shall assume Five Thousand Dollars ($5,000.00). BRODSKY would, therefore, be required to reimburse REIFF to the extent of Eleven Thousand Five Hundred Dollars ($11,500.00).

"The above formula and figures are merely for the purpose of determining the loss in the event that the place of business is closed. The figures are not accurate, but merely for the purpose of giving an example."

At trial, plaintiff sought to prove to the satisfaction of the jury that under this agreement, and applying the said formula, that defendant was obligated to pay him the sum of $23,149.94. Defendant asserted that he was not obligated to pay plaintiff anything because of plaintiff's failure to prove an actual loss sustained, and also asserted that the contract of July 3, 1958, was a contract of indemnity. At the conclusion of the trial before the undersigned judge and a jury, a verdict in favor of plaintiff in the amount of $9,858.50 was returned. Defendant filed a motion for judgment non obstante verdicto which is presently before the court for disposition. Plaintiff filed a motion for a new trial which was subsequently withdrawn.

Therefore, we do not have to make any inquiry into, or evaluation of, the proofs of plaintiff with respect to damages, or the portions of the trial judge's charge which concern themselves with damages. The basis for defendant's motion is simply that the trial judge was in error in refusing to charge the jury, as a matter of law, that the contract of July 3, 1958, was a contract of indemnity and that, therefore, plaintiff could recover only if he proved actual loss. Also, defendant contends that the trial judge was in error in refusing certain points for charge to the effect that such agreement was

a contract of indemnity, that it must be construed most strictly against plaintiff, and that plaintiff, in order to recover, must show actual loss.

The court has considered all of the authorities cited by defendant in his brief, and has reviewed the record in this proceeding, and is satisfied that the July 3, 1958, agreement was *not* a contract of indemnity, and that the trial judge committed no error in his instructions to the jury concerning the law that the jury should apply to the July 3, 1958, agreement in determining what the intendment of the parties was in entering into such agreement and what the rights and obligations of the parties thereunder actually were. Although this agreement has some of the attributes of a contract of indemnity, the court believes that defendant has confused indemnity with a contract to pay. 27 Am. Jur., Indemnity §2, states as follows:

". . . A contract to pay has been frequently distinguished from an agreement to indemnify in that a right of action on the former accrues as soon as there is a breach, whereas no action is maintainable in the case of a strict contract of indemnity—indemnity against loss—until the indemnitee has suffered a loss against which the covenant runs. . . ."

See Wicker v. Hoppock, 73 U. S. 94 (1867) ; Central States Grain Co-Operative v. Nashville W. & E. Corp., 48 F. 2d 138 (1931) ; St. Paul Fire & Marine Ins. Co. v. Charlton, 231 S. W. 862 (Tex. Civ. App.) (1921).

An exhaustive review of the authorities by the writer of this opinion fails to reveal any decided Pennsylvania cases which are helpful in determining precisely what the contract in the instant case should be labeled. Actually, throughout all of the various jurisdictions in the United States there is a similar lack of helpful authority on the precise point. However, in the case of Stuart v. Carter, 79 W. Va. 92, 90 S. E. 537 (1916), the court said as follows: (90 S. E. p. 539)

"The inquiry raised by the exception involves consideration of a distinction and principle not extensively discussed or applied, if at all, in the decisions of this court, but often adverted to and made effective in cases arising in other jurisdictions, namely, the distinction between a bond or other contract binding the obligated parties to do particular things for prevention of injury and damage to the obligee, and a contract of mere indemnity, binding the obligors to make good an injury or damage, or compensate for it, after occurrence thereof. In the former case, the obligee or covenantee may sue for and recover the money the obligors or covenantors bound themselves to pay, by way of indemnity against liability, without having paid the same. In the latter case, he must have paid the money and so suffered actual loss, before he can sue for the breach of the contract. As has been stated, the distinction turns upon the form of the condition or covenant. . . ."

We should then turn to the precise language of the agreement that is the basis for this suit. Although the courts have repeatedly said that no particular verbiage is necessary to make the undertaking a contract of indemnity, nevertheless it should contain language which is the equivalent of the classic "save, keep harmless, and indemnify" clause: E. P. Wilbur Trust Company v. Eberts, 337 Pa. 161, 167 (1940). In this case there is no such language present but rather the clause "agrees to assume" is the only language which defendant could contend would make this agreement one of indemnity. As said before, the court believes that this undertaking by defendant is simply a contract to pay, or assume, a certain portion of the loss sustained by plaintiff as a result of the court injunction closing the taproom. Furthermore, indemnity has repeatedly been defined as the right which a person has who has been compelled to pay what another should be forced to pay *in full:* Lockwood v. Nagy Bros., Inc., 186 A. 2d 82

(Conn.) (1962) ; 27 Am. Jur., Indemnity §2. In defendant's brief, he cites the case of Lehr v. Melton, 44 P 2d 111 (Oklahoma), wherein the court held that a contract in which defendant obligated himself to bear one-half plaintiff's loss was a contract of indemnity. From the research of the writer of this opinion, it would seem apparent that this case stands alone for this proposition. In the instant case defendant obligated himself to pay plaintiff a certain sum of money to be determined or ascertained by the application of the formula contained in the agreement, which obviously was less than full reimbursement or compensation. Another distinction between the instant agreement and a contract of indemnity is that the July 3, 1958, written agreement was not a separate undertaking of the parties, but, rather, was interrelated with the previous written agreement between the parties dated April 2, 1958. The trial judge so charged the jury and we find no error therein. At page 461 of the notes of testimony the trial judge charged as follows:

"This agreement of July 3, 1958, I am charging you, is in effect a supplement to or a modification of another agreement which is in evidence, namely, the agreement of April 2, 1958, which was the agreement of sale entered into between Mr. Reiff and Mr. Brodsky, in which Mr. Brodsky agreed to sell and convey and transfer the real estate located at 19th and Pacific Avenue in the city of Philadelphia, as well as the restaurant and taproom business that was located therein, and of which Mr. Brodsky was the then owner.

"So that in order to construe this agreement, you must consider the verbal testimony which would bear upon the intent or the meaning of this contract, and in interpreting and finding what the parties intended by the terms of the contract of July 3, 1958, you can also look at the terms of the April 2, 1958, agreement.

"There is no requirement in the law that a contract between certain parties must be evidenced by a single instrument. The parties may, in reducing an agreement to writing, by further writing supplement or modify the original understanding."

It is admitted that the suit seeking an injunction to close the taproom at the premises which were the subject of the original agreement between these parties had been instituted before the agreement of sale was executed on April 2, 1958. This suit was pending throughout all of the dealings between the parties, and placard bearing pickets paraded in front of the establishment regularly throughout the period of the pendency of the suit. It is admitted that plaintiff had no knowledge of the suit and the pickets at the time he entered into the April 2, 1958, agreement, but subsequently learned thereof before the parties held their closing settlement on June 16, 1958. Quite naturally, plaintiff was gravely concerned about this obvious threat to his investment. There was credible testimony that the parties reached an oral understanding concerning the matter before plaintiff paid to defendant the consideration called for in the agreement of sale. There was credible testimony that such oral understanding was reduced to writing in the form of the July 3, 1958, agreement. This is further corroborated by the very language of the July 3, 1958, agreement in its preamble wherein it states:

"WHEREAS, by Agreement dated April 2, 1958, REIFF did purchase from BRODSKY the building at 3620 North 19th Street, Philadelphia, together with the restaurant and barroom, including a restaurant liquor license, located therein; AND

"WHEREAS, on June 16, 1958, title to the premises 3620 North 19th Street was conveyed to the nominee of REIFF, being B I D, Inc; AND

"WHEREAS, on June 16, 1958, title to the restaurant and barroom, including the liquor license, was transferred to LANE BAR, INC., being the nominee of REIFF; AND

"WHEREAS, there were certain legal entanglements and law suits involved with the premises resulting from neighborhood protests and picketing, which resulted in a Complaint in Equity for the purpose of securing an injunction to have the place of business closed as a nuisance; AND

"WHEREAS, BRODSKY did make certain promises to REIFF in event that the Court ordered the restaurant and barroom closed."

Therefore, we believe the trial judge was correct in charging the jury as follows (N.T. 465, 466) :

"Now, also at that time" [June 16, 1958, the date of settlement] "it would seem to be uncontroverted that Mr. Brodsky knew of a pending suit in equity in the courts of Philadelphia, in which certain parties, neighbors of the premises at 19th and Pacific, had instituted an action seeking an injunction from the Court of Common Pleas of Philadelphia County, in which they asked that court to enjoin the further and continuing operation of this barroom business.

"It is admitted in the pleadings and it has been offered in evidence that that suit was instituted on March 16, 1958, some two or two and a half weeks before the agreement of sale was entered into with Mr. Reiff.

"Also, it would seem to be in the knowledge of everyone by June 16, 1958, that that suit was still pending, and furthermore, that there were pickets—that is, we all know what pickets are, human beings, standing or walking in front of the premises at 19th and Pacific, presumably carrying placards or carrying some kind of a sign with a legend on it. That hasn't been brought out in the evidence, but I think in this day and age of

involvements between labor and management in all kinds of fields, it is in the common knowledge of everybody, including all members of the jury, what is meant by the word 'picket.' I don't believe it was brought out in the evidence precisely what the pickets were in this case, or who they were or what they carried. But at least there was some organized effort on the part of somebody to dissuade people from patronizing this business establishment, or protesting something.

"Now, with the knowledge of those things going along, and with this background I have just gone over, these two gentlemen signed an agreement, which gives rise to this suit. And you, as the finders of fact must say, 'What did they intend to be the consequences of their act by signing this agreement?' "

The jury, under the instructions of the trial judge and upon consideration of all of the evidence, determined that defendant had obligated himself to pay to plaintiff that sum which he had "agreed to assume," applying the contractual formula to the proofs submitted. The amount of the verdict was considerably less than the sum that plaintiff contended was due and owing him under the terms of the written agreement. There was no question that plaintiff suffered a financial loss as a result of the final injunction closing the taproom. The parties determined that this loss should be borne jointly by plaintiff and defendant. The result of the jury's verdict is that defendant simply is compelled to pay to plaintiff the amount of his profit on the sale in the first instance plus an additional sum slightly in excess of $3,000 to make up the total amount of the jury's verdict. We can see no injustice to defendant by reason of this verdict, either under the facts or under the law.

### Order

And now, January 8, 1964, the motion for judgment non obstante verdicto is refused, and the prothonotary

is directed to enter judgment on the verdict upon prae-
cipe being filed.