Louis Pottock, Trading as Pottock's Junk Shop,
Plaintiff,

*vs.*

Continental Can Co., Inc.,
a New York corporation,
Defendant.

*New Castle, June 23, 1965.*

*Samuel R. Russell,* of Bayard, Brill, Russell & Handelman, Wilmington, for plaintiff.

*Frank J. Miller,* of Walker, Miller & Wakefield, Wilmington, for defendant.

SEITZ, Chancellor: This is the decision after final hearing on a claim of private nuisance. My factual evaluation is based on the relevant evidence and a view of both premises.

Plaintiff is the lessee of a lot at 1401 Thatcher Street, Wilmington, on which he and his father before him have operated a junk yard, trading as Pottock's Junk Shop, since about 1945. Defendant, Continental Can Company, Inc., and its predecessor have, since long before 1945, operated an industrial plant at Sixteenth and Locust Streets. It, in part, abuts on plaintiff's yard.

The complaint filed November 29, 1963, charged that substantial quantities of oily fallout soot, emitted from a smokestack serving defendant's boiler and located immediately adjacent to the parties' mutual property line, are deposited on the plaintiff's yard. Plaintiff alleges that such condition is a nuisance and he seeks both a permanent injunction and damages. Defendant's answer denied the existence of a nuisance, alleged certain affirmative defenses, and set forth a counter-claim for an injunction. Defendant has now explicitly abandoned its affirmative defenses and counter-claim.

Defenses dealing with the adequacy of the remedy at law and exhaustion of administrative remedies were raised before trial and were stricken as insufficient in law. See *Pottock, Trading as Pottock's Junk Shop v. Continental Can Co.,* 42 *Del.Ch.* 296, 210 *A.2d* 295, (March 9, 1965). Counsel stipulated that the issue of nuisance would be tried while the question of damages would be reserved.

Plaintiff's business area consists of about one acre. He buys and sells metals and rags. Some of the metal is processed by sorting or cutting it to a prescribed size. He also bales the rags. The rags are for the most part stored in covered areas. However, most of the metal is left exposed to the elements and much of the exposed material is turned over rather quickly. If one were to generalize, it would be fair to say that plaintiff operates a rather typical looking junk yard. The use district where plaintiff operates is zoned M-1 (light manufacturing). Junk yards are excluded from M-1 districts. However, plaintiff operates under a non-conforming use certificate.

Defendant's plant, which primarily manufactures bottle caps, conforms to the zoning classification. However, a Wilmington ordinance prohibits the emission of cinders, dust, or fly ash in quantities which damage property, or unreasonably interfere with the comfort of persons. *Revised Building Zone Ordinance of City of Wilmington, Article 7*, § 07633 (1962). I infer that the test contained in the ordinance may be equated with the standard applicable to private nuisances of this type generally.

The problem in this case arises because, in the course of its operation, defendant finds it necessary to blow accumulated soot deposits out of one of its boilers. The soot is forced up the smokestack and out into the atmosphere. This particular boiler is described as a Babcock-Wilcox Type FM 9 water tube boiler. It is blown by spraying high pressure steam through the passes of the boiler. This dislodges the deposits which have accumulated. The process takes from one to three minutes and is done once every twenty-four hours between twelve midnight and 7:00 A.M. The blowing of tubes has been a daily occurrence since the boiler was installed in 1954, which, I note, was after plaintiff commenced its operation at its present location. The prevailing wind is such that it carries much of the soot over a portion of plaintiff's property.

While plaintiff testified that there had been some basis for complaint prior thereto, he claims that starting in April 1963 soot from the defendant's stack has been falling on his property in greater

amounts and damaging it. This is the basis of his claim of nuisance. It appears without contradiction that in April 1963, the sootfall was a daily occurrence, covering half the yard, and that the soot was saturated with unburned oil. Plaintiff made complaints to the defendant and the condition was apparently abated somewhat through the summer months. The reason, if any, for the abatement was not shown except for the suggestion that the use of the boiler in the summer is not as intensive as during the cooler months. I find that the objectionable activity resumed at some point and existed when this action was filed in November 1963. Chemical tests by plaintiff's expert confirm the oily properties of the soot until early December 1963. In late November of that year defendant began to use a chemical compound known as Soot-Off, which is designed to increase the combustibility of soot and thereby reduce oiliness and accumulations. Thereafter, the amount of soot emitted from the defendant's stacks was at least cut in half. Moreover, and of prime importance, I find that it can be said for our purposes that the oily properties of the soot emitted were eliminated by the use of Soot-Off. This is significant because the oily soot increased the threat of fire and burns to the worker using the blow torch in plaintiff's yard.

At the time of the trial plaintiff testified that the sootfall on his land had decreased in frequency to once a week even though the boilers are blown daily. The apparent inconsistency can perhaps be explained by the varying strength and direction of the wind, as well as the varying amounts of sootfall emitted.

I must decide initially whether a nuisance existed at the trial date because injunctive relief will not be granted if the assumed nuisance had been abated. Certain pertinent legal principles may first be noticed. Smoke and soot are not nuisances per se. 39 *Am.Jur.*, *Nuisances* §54. In order for smoke (or soot) to constitute a nuisance, it must be emitted in unreasonable amounts or in an unreasonable manner in view of the locality and surroundings. 39 *Am.Jur.*, *Nuisances* §54; compare *Hannum v. Gruber*, 346 *Pa.* 417, 31 *A.2d* 99. In a nuisance action the plaintiff must clearly establish that he suffers substantial harm. *Pruett v. Dayton*, 39 *Del.Ch.* 537, 16 *A.2d* 543,

545; 39 *Am.Jur., Nuisances* § 153. The injury must be more than *de minimis* to warrant discretionary injunctive relief. *MacArtor v. Gray-lyn Crest III Swim Club, Inc.,* 41 *Del.Ch.* 26, 187 *A.2d* 417, 421.

Passing over other considerations, the primary issue in this case is the substantiality of the harm to the plaintiff. Parenthetically, there is no issue here of negligence in the operation of the boiler. First off, and of real importance, the oily properties of the soot, which could create a fire hazard and which could spot plaintiff's metals and rags and thereby materially interfere with his business, have been eliminated by the use of Soot-Off. Next, while there is some sulphur dioxide and trioxide discharged, which in the presence of moisture forms sulphuric acid, I find that it is not sufficiently concentrated here to cause material harm.

While I find that some of the soot being discharged from defendant's chimney falls on some part of plaintiff's property, the question is whether the amount thereof, whether from each sootfall or cumulatively, is sufficiently substantial to constitute a private nuisance under all the facts.

The size of the soot particles are measurable only in thousandths of an inch. There are indications that some of these small particles cluster together to make larger ones which occur in sizes as large as half the size of a pea, but I find that this is not usual. Even though the size of the aggregates would seem substantial, another test made by gathering a sample from a flat surface on plaintiff's property showed that only 0.583 ounces of soot per hundred square feet were deposited during what was described as a heavy sootfall. What is more, the characteristics of the clusters are such that any disturbance by wind, rain or vibration causes them to break down into dust particles. In the course of plaintiff's business, metals are loaded on gondola cars with an electro-magnetic crane, which drops the scrap into the cars. Any soot laying on the metals would surely be jarred loose by the impact. The rags are covered for the most part and, on balance, I do not believe the amounts of soot now deposited during any pertinent period of time cause damage of a character to justify injunctive relief here.

█ Plaintiff's other evidence concerning the substantial nature of the harm and the intensity of the sootfall does not aid plaintiff's case. This evidence in large part consists of AISI Automatic Air Sampler tests run in the period between January and November 1964. These tests were run with the use of an automatic air sampler. This machine draws air from the atmosphere through filter paper. A photo-electric cell and an ammeter are used to measure the degree of discoloration. These tests do not measure particles that are greater than 10 microns, which create sootfall or dustfall that settles from the air by gravity. What these tests measure are the smoke and haze in the atmosphere. Thus, they are not helpful here. Indeed, the results may be interpreted to show a generally bad haze condition in the area not solely attributable to defendant. In any event, there is no meaningful correlation between the results of the tests and the times when defendant blew the boiler. A still further infirmity in this evidence is that, while a scale for interpreting the AISI Sampler's results was provided, it appears that this scale was developed in New Jersey for use there. No evidence of normal "soot" levels in Wilmington was produced, and so no standard for comparison appears in the record by which to evaluate the readings.

Certain photographs of soot deposits on the plaintiff's property were also introduced. They cover the period between April 1963 and March 1965. These photographs demonstrate what is the fact, viz., that soot did and does fall on plaintiff's property. However, I am satisfied that the sootfall does not have an oily characteristic now and indeed the amount of the sootfall has been substantially reduced. I conclude that the present sootfall does not result in substantial harm to plaintiff's operations.

Defendant appears to be operating its boiler reasonably. Plaintiff's own expert testified that the defendant's operation is fairly efficient. It also appears that the soot blowing procedure is standard boiler maintenance practice and that such boilers as the one in question are in widespread use in the Delaware Valley. In fact the apparatus used in blowing the tubes is delivered as part of a new boiler by manufacturers. It also appears that while defendant burns low grade fuel oil, it is commonly used in industrial plants.

The plaintiff contends that there are devices on the market which, if used, would substantially diminish the defendant's soot output. The minimum cost of such a machine would be $10,000. It also appears that such devices are not widely used in this area. In any event, I do not believe we are concerned with a situation where the sootfalls are in such amounts that defendant must prove, if such be the law, that there is no feasible way to further remedy the situation.

It may be noted that this case concerns harm to a junk yard in an area zoned for manufacturing. Much of the material on which the soot falls is already dirty and often rusting. This is a factor, along with others, in evaluating the substantiality of the harm, particularly in view of the zoning classification.

Because plaintiff has failed to prove substantial harm under the circumstances, I conclude that injunctive relief should be denied. However, I feel that the situation prior to the introduction and use of Soot-Off in late 1963 did constitute a nuisance, and that it existed when the complaint was filed. The quantity of the soot then discharged, not to mention its oiliness, was at least twice as much as it was after Soot-Off was employed. The oiliness of the deposits coming from defendant's soot caused harm to the roofs and equipment. It also constituted a safety hazard because of the fire threat. Whether there was recoverable damage to the materials which plaintiff had during the period in question must await a trial.

Defendant says that plaintiff testified that the condition was "Nothing to even worry about" in 1962. It next points out that the only proved change in defendant's operation between 1962 and 1964 was the use of Soot-Off which admittedly improved the situation. Therefore, argues defendant, there could not have been a nuisance by defendant in 1963. There is logical appeal to defendant's contention. However, I believe the physical facts in 1963 as I have found them dictate a contrary result. The amount of soot discharged is somewhat dependent upon the temperature employed in the boiler and it is entirely possible that this or some other variable was responsible for the increase in the amount of soot in part of 1963.

There having been a nuisance in existence when the complaint was filed, the plaintiff is entitled to pursue his request for damages during the pertinent period. However, it must be the subject matter of a further hearing. The request for injunctive relief will be denied.

Present order on notice.